UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

UNITED STATES OF AMERICA

          - v. -                 **SEALED**

                                  **INDICTMENT**

BRANDON BECKER and
STEVEN BREIER,                    S2 19 Cr. 704 (LAP)

          Defendants.

------------------------------------ X

## COUNT ONE
**(Conspiracy to Commit Wire Fraud and Bank Fraud)**

The Grand Jury charges:

### OVERVIEW OF THE FRAUD SCHEME

1. From in or about 2012 through at least in or about 2015, BRANDON BECKER and STEVEN BREIER, the defendants, together with others known and unknown, participated in a scheme to fraudulently obtain millions of dollars of credit/debit card processing from a financial institution ("Bank-1") and its payment processor ("Payment Processor-1") by submitting falsified merchant applications in the names of various sham companies. The merchant applications falsified material information relevant to the decision of Bank-1, Payment Processor-1, and their processing partners, to issue payment card processing services and make payments to those sham merchants. The merchant applications falsified the name

and nature of the underlying business, and details about the business's physical site and employees, among other things.

2.     BRANDON BECKER and STEVEN BREIER, the defendants, and their co-conspirators perpetrated the scheme through CardReady, LLC ("CardReady"), a California-based company of which BECKER served as the chief executive officer ("CEO") and to which BREIER brought potential merchant clients.  In return for extraordinary fees, ranging up to a third of a merchant's transaction volume, CardReady made it possible for certain merchants engaged in deceptive sales practices to conceal their identities, gain and maintain access to the payment card processing system, spread out charges across multiple sham merchant accounts, and obtain money from payment processors and federally insured banks, including Payment Processor-1 and Bank-1.

3.     In one particular instance, the scheme enabled payment card processing for a Florida-based telemarketing scheme operated by "Telemarketer-1," a telemarketer that sold credit card interest rate reduction and debt reduction programs, as well as other purported "budgeting" services, to thousands of customers carrying substantial credit card debt. (the "Telemarketing Scheme").  The Telemarketing Scheme

2

enabled Telemarketer-1 to process over $19 million in transactions from its customers across 26 sham merchant accounts. Over $6 million of that amount was ultimately repaid to consumers in refunds and chargebacks based on customers' allegations of fraud, deceptive tactics, and failure to receive the purchased services, among other things.[1]

### Relevant Persons and Entities

4. From at least in or about 2012 through in or about 2015 (the "Relevant Time Period"), BRANDON BECKER, the defendant, was the CEO and *de facto* head of CardReady.

5. At all times relevant to this Indictment, STEVEN BREIER, the defendant, was a sales agent for CardReady, who introduced BRANDON BECKER, the defendant, and CardReady to various high risk merchants seeking to obtain payment processing purposes in exchange for commissions based in part on a portion of such merchants' card processing volume.

6. During the Relevant Time Period, Telemarketer-1 was a set of affiliated companies located in Florida, whose

---

[1] Unlike a refund, which is voluntarily processed by the merchant, a chargeback is a reversal of a transaction initiated by the customer through his or her credit card company due to unauthorized use, fraud, or failure to receive the product or serviced purchased, among other things.

3

telemarketers cold-called customers and sold them various purported financial services at costs ranging from approximately $695 to at least $1,495. Telemarketer-1 was a client of CardReady that obtained card processing services for its transactions from Bank-1 and Payment Processor-1.

7.   During the Relevant Time Period, CardReady was a company headquartered in Los Angeles, California, commonly referred to in the payment card processing industry referred to as a "sales agent" or sub-Independent Sales Organization ("sub-ISO"). CardReady offered card processing services to businesses that wanted to be able to accept credit or debit cards. Specifically, among other things, CardReady helped to prepare and submit merchant applications to a New York City-based independent sales organization (the "New York ISO") that had a contractual relationship with Payment Processor-1 and Bank-1.

8.   During the Relevant Time Period, the New York ISO was a company headquartered in New York City, New York. The New York ISO, among other things, reviewed and evaluated new merchant applications submitted by CardReady to determine whether to accept the merchant for processing with Payment Processor-1 and Bank-1 pursuant to the standards and

4

guidelines set forth by the New York ISO, Payment Processor-1, and Bank-1.

9. During the Relevant Time Period, Payment Processor-1 was a limited liability company with a principal place of business in Atlanta, Georgia. Payment Processor-1 provided payment technology and card processing services for Bank-1.

10. During the Relevant Time Period, Bank-1 was a financial institution headquartered in Sioux Falls, South Dakota, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC").

## The Payment Card Processing Industry

11. In order to accept payment cards (*i.e.,* credit and debit cards) from customers purchasing goods and services, a business is required to complete a merchant application and establish a merchant account with a sponsoring bank that is a member of the "Credit Card Networks" (*e.g.,* Visa, MasterCard, American Express, and Discover) that authorize merchants to accept payments through the payment card system. Various entities often act as intermediaries between merchants and sponsoring banks. These entities sometimes include sales agent companies like CardReady, which find merchants, agree to

5

obtain processing services for the merchants, and submit merchant applications to an ISO, payment processor, and/or sponsoring bank. Other intermediaries can include ISOs that review merchant applications, and submit acceptable merchants to obtain payment processing services from the payment processor and the sponsoring bank associated with the ISO.

12.   These relationships are often regulated by contracts among the sales agent, the ISO, the payment processor, and the sponsoring bank, which incorporate contractually agreed-upon guidelines, policies, rules, and standards from the Credit Card Networks, sponsoring bank, and its associated payment processor (collectively, and as relevant to CardReady, the "Guidelines").

13.   During the Relevant Time Period, the Guidelines prohibited CardReady from submitting to the New York ISO for payment processing certain "unqualified" businesses, including those marketing debt consolidation, credit repair, and interest rate reduction services. The Guidelines also prohibited the New York ISO or Payment Processor-1 from accepting merchants engaging in deceptive tactics to avoid chargeback monitoring programs, such as by splitting their

6

transactions among sham merchant accounts opened in other entities' names, among other things.

### Means and Methods of the Conspiracy

14. In or about 2012, STEVEN BREIER, the defendant, introduced Telemarketer-1 to BRANDON BECKER, the defendant, and CardReady. BECKER and BRIER negotiated a deal with a co-conspirator, the principal of Telemarketer-1, ("CC-1") to provide payment card processing for Telemarketer-1. Pursuant to this agreement, CardReady would retain approximately one-third of Telemarketer-1's credit card sale transactions in exchange for providing Telemarketer-1 access to the payment card processing network. Under a side agreement between BECKER and BREIER, BREIER would receive approximately one-half of CardReady's share of the profits from this deal.

15. During the Relevant Time Period, Telemarketer-1 was engaged in a marketing scheme in which it cold-called customers and offered services, including debt consolidation and interest-rate reduction, which were prohibited by the Guidelines and which — as BRANDON BECKER and STEVEN BREIER, the defendants, well knew — would produce chargebacks from dissatisfied customers far in excess of the number and rate of chargebacks permitted under the Guidelines.

16.    In securing payment card processing for Telemarketer-1, BRANDON BECKER and STEVEN BREIER, the defendants, together with others known and unknown, concealed that Telemarketer-1 was the true underlying merchant. During the Relevant Time Period, BECKER, BREIER, and their co-conspirators, over a period of more than twenty months, created approximately 26 sham merchant companies, each headed by a "signer" (the "Sham Merchants" and the associated merchant accounts, the "Sham Merchant Accounts").

17.    The 26 "signers" for the 26 Sham Merchants typically had no business of their own, and lacked knowledge of Telemarketer-1's business. In return for signing the paperwork provided to them, the signers were paid a nominal fee from CardReady.

18.    BRANDON BECKER and STEVEN BREIER, the defendants, and others known and unknown, prepared and coordinated fraudulent merchant applications for each of the Sham Merchants.  Those merchant applications falsely described the purported business, physical site, and employees of each of the Sham Merchants to make them look like legitimate independent businesses, and make it more likely that the associated Sham Merchant Account would be approved for

8

processing by the New York ISO, Payment Processor-1, and Bank-1.

19.   The merchant application for each Sham Merchant also concealed the Sham Merchant's true association with Telemarketer-1, as well as with other prior Sham Merchant Accounts used for Telemarketer-1's transactions, including Sham Merchant Accounts previously terminated by Bank-1 and Payment Processor-1 for excessive chargebacks.

20.   BRANDON BECKER and STEVEN BREIER, the defendants, together with others known and unknown, caused CardReady to submit the false merchant applications for the Sham Merchants to the New York ISO. In furtherance of the scheme, BECKER and BREIER caused phone calls and e-mails to be made from CardReady's offices in California to the New York ISO's offices in New York City. The New York ISO approved the Sham Merchant Accounts and under the authority delegated to it, opened the accounts for payment processing with Payment Processor-1 and Bank-1.

21.   BRANDON BECKER, the defendant, caused bank accounts to be opened for each of the Sham Merchants, in order to obtain transaction payments from Bank-1. The bank accounts were controlled by BECKER and other employees at CardReady,

9

and not by the signers on whose behalf the accounts were purportedly opened.

22.   Between 2012 and 2014, Bank-1 processed over $19 million in sales from customers of Telemarketer-1 through the bank accounts associated with the 26 Sham Accounts.  Bank-1 also processed certain additional transactions through some of the Sham Merchant Accounts in or about 2015, including chargebacks.

23.   By steering Telemarketer-1's payment processing through these Sham Merchant Accounts, BRANDON BECKER and STEVEN BREIER, the defendants, and their co-conspirators accomplished a number of fraudulent purposes.

a.   First, the use of these Sham Merchant Accounts made it possible for Telemarketer-1 and other high-risk merchants to conceal their identities from Payment Processor-1 and Bank-1 and maintain payment card processing. This was particularly relevant as Payment Processor-1 repeatedly required CardReady to close individual Sham Merchant Accounts because of excessive chargebacks and reports of sales of prohibited services. BECKER and BREIER then caused CardReady to quickly replace the closed Sham Merchant Accounts with new Sham Merchant Accounts, precluding Payment Processor-

10

1 from shutting down its processing of Telemarketer-1 and other high-risk merchants.

        b.    Second, the fraudulent processing scheme enabled Telemarketer-1 and other high-risk merchants to spread out their charges, refunds, and chargebacks across multiple Sham Merchant Accounts. This enabled them to evade chargeback monitoring programs operated by Bank-1, Payment Processor-1, and the New York ISO.

        c.    For example, under the Guidelines, merchant accounts that accrued over 100 chargebacks per month and a ratio of more than 1% of chargebacks to transactions, were likely to be flagged and terminated. The Sham Merchant Accounts in the Telemarketing Scheme averaged over 10% chargebacks every month after July 2013, and ranged as high as approximately 61% chargebacks in August 2014, two months before the last of the Sham Merchant Accounts was terminated by Payment Processor-1. Collectively, these Sham Merchant Accounts exceeded 100 chargebacks per month from at least about July 2013 through October 2014. However, because Telemarketer-1's transactions were split across the Sham Merchant Accounts, none of the Sham Merchant Accounts individually exceeded 100 chargebacks a month, making it less

11

likely that each Sham Merchant Accounts would be expeditiously flagged and terminated.

## STATUTORY ALLEGATIONS

24. From at least in or about 2012 through at least in or about 2015, in the Southern District of New York and elsewhere, BRANDON BECKER and STEVEN BREIER, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344.

25. It was a part and an object of the conspiracy that BRANDON BECKER and STEVEN BREIER, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to

12

wit, BECKER and BREIER engaged in a scheme at CardReady to create shell companies, falsify merchant applications, and submit sham merchant accounts to obtain payment card processing services and to obtain more than $19 million from a financial institution, Bank-1, which scheme involved the use of interstate wires, including interstate wires into and out of the Southern District of New York.

26. It was further a part and an object of the conspiracy that BRANDON BECKER and STEVEN BREIER, the defendants, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation("FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, BECKER and BREIER engaged in a scheme to falsify merchant applications and create sham merchant accounts to obtain payment card processing services and to obtain more than $19 million from Bank-1.

13

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Make False Statements to a Bank)

The Grand Jury further charges:

27.  From between in or about 2012 through in or about 2015, in the Southern District of New York, and elsewhere, BRANDON BECKER and STEVEN BREIER, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, making a false statement to a bank, in violation of Title 18, United States Code, Section 1014.

28.  It was part and object of the conspiracy that BRANDON BECKER and STEVEN BREIER, the defendants, and others known and unknown, willfully and knowingly, made false statements for the purpose of influencing the action of a financial institution, as defined in Title 18, United States Code, Section 20, upon an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, by stating and causing to be stated false information on merchant applications and other documents submitted through CardReady to obtain and maintain payment card processing, including as to the nature of the merchant's

14

business, employees, and storefront, when in truth and in fact, as BECKER and BREIER well knew, such statements on the merchant account applications and other documents were false.

## Overt Acts

29. In furtherance of this conspiracy and to effect the unlawful objects thereof, the following overt acts were committed in the Southern District of New York and elsewhere.

a. On or about the dates set forth below, BRANDON BECKER, STEVEN BREIER, the defendants, and others caused the following Sham Accounts to be opened pursuant to falsified merchant applications submitted via interstate wires to the New York ISO in the Southern District of New York, in order to process credit and debit card transactions for an underlying telemarketing business selling debt consolidation and interest rate reduction services, as well as other purported "budgeting" services.

15

| MERCHANT ACCOUNT | OPEN | CLOSED |
|---|---|---|
| Sham Merchant Account-1 | 04/22/13 | 9/5/13 |
| Sham Merchant Account-2 | 10/24/13 | 5/31/14 |
| Sham Merchant Account-3 | 05/28/13 | 9/5/13 |
| Sham Merchant Account-4 | 07/05/13 | 10/18/13 |
| Sham Merchant Account-5 | 04/11/14 | 7/9/14 |
| Sham Merchant Account-6 | 11/01/12 | 5/28/14 |
| Sham Merchant Account-7 | 06/09/14 | 10/24/14 |
| Sham Merchant Account-8 | 08/29/13 | 11/14/13 |
| Sham Merchant Account-9 | 10/24/13 | 1/27/14 |
| Sham Merchant Account-10 | 02/15/13 | 9/5/13 |
| Sham Merchant Account-11 | 06/13/13 | 9/5/13 |
| Sham Merchant Account-12 | 07/30/13 | 2/28/14 |
| Sham Merchant Account-13 | 02/04/14 | 7/3/14 |
| Sham Merchant Account-14 | 02/10/14 | 7/3/14 |
| Sham Merchant Account-15 | 07/25/13 | 2/28/14 |
| Sham Merchant Account-16 | 09/04/12 | 6/9/14 |
| Sham Merchant Account-17 | 03/08/13 | 7/25/14 |
| Sham Merchant Account-18 | 11/01/12 | 6/9/14 |
| Sham Merchant Account-19 | 01/15/14 | 5/7/14 |
| Sham Merchant Account-20 | 02/01/14 | 5/31/14 |
| Sham Merchant Account-21 | 06/09/14 | 10/20/14 |
| Sham Merchant Account-22 | 02/10/14 | 4/29/14 |
| Sham Merchant Account-23 | 01/14/14 | 5/31/14 |
| Sham Merchant Account-24 | 09/04/13 | 1/27/14 |
| Sham Merchant Account-25 | 01/23/14 | 7/7/14 |
| Sham Merchant Account-26 | 03/12/14 | 9/13/14 |

b.     On or about April 25, 2013, an executive

employee of CardReady ("Employee-1") sent BECKER and BREIER an

e-mail forwarding a press release and complaint from the

Federal Trade Commission ("FTC") about a civil action the FTC

had brought against a telemarketing scam similar to the

Telemarketing Scheme, with the headline "FTC Brings Seventh

16

Action in Three Months Against Debt Relief Companies Tampa Telemarketers Alleged to Have Falsely Promised To Save Consumers Thousands on Credit Card Debt." In that email, Employee-1 wrote, in part, "From what I see there is great exposure and we should be shutting this animal down as quickly as we can do so without it crashing. If they do not have a defense for the type of charges contained in the link here, than there is no defense that will work and our merchants are fully exposed."

c. On or about May 23, 2014, BECKER wrote an email to Employee-1 stating, in part, "I'm seeing the [Telemarketer-1] refunds and [chargebacks] at high numbers – we really need to start building the reserve from his side if were [sic] to wind out of this. Especially with the hope of keeping the funds we already earned, which we must for all the risk."

d. On or about May 23, 2014, in an email in response to BECKER's e-mail described in the preceding subparagraph, Employee-1 characterized the numbers as "pretty awful," and attached a spreadsheet ("Spreadsheet-1"), which reflected information about the chargebacks on 24 Sham Accounts used for the Telemarketing Scheme.

17

i.     Spreadsheet-1, entitled "CB

[chargeback] Activity 4 months to 5-23-14," contained the

names of the 24 Sham Merchant Accounts that had been

opened to date, along with the dates they were opened and

the dates that 12 of the accounts had been closed, as

well as the dates certain additional Sham Merchant

Accounts were scheduled to be closed by Payment

Processor-1.

ii.     Next to the name of each Sham

Merchant Account, Spreadsheet-1 contained a code number

associated with BREIER, identifying BREIER as the "agent"

associated with that Sham Merchant Account.  Another

column, labeled "Sub Agent," contained the name of

Telemarketer-1 as well as the name of CC-1, for every one

of the 24 Sham Merchant Accounts.

iii.     Spreadsheet-1 contained four tables

reflecting sales and chargeback activity for each of

approximately four months prior to about May 23, 2014.

The "Sales" column contained entries for each of the Sham

Merchant Accounts, with a total the bottom, indicating

Telemarketer-1's collective sales spread across the Sham

Merchant Accounts.  In the approximately four-month

18

period depicted on Spreadsheet-1, the total sales for the Sham Merchant Accounts averaged approximately $1.1 million a month.

iv. Spreadsheet-1 reflected that, for the month of April 2014, the chargeback percentages ranged from about 4% to about 29% for each of the open Sham Merchant Accounts. Spreadsheet-1 also reflected chargeback percentages for other months.

e. Spreadsheet-1 indicated that in approximately three months from March to May 2014, slightly over $1 million was paid back to Telemarketer-1's customers through refunds and chargebacks.

f. On or about May 27, 2014, Employee-1 sent a substantively identical copy of Spreadsheet-1 to CC-1, copying BREIER. Employee-1 wrote, in part and substance, "These numbers continue to be terrible. If this program was stopped we would bleed out nearly a million dollars in the first three months. We are going to have to take more reserves to accumulate more protection."

g. From on or about June 2014, BECKER and BREIER continued the Telemarketing Scheme, including processing new sales charges from Telemarketer-1's customers

19

through the Sham Merchant Accounts, in order to protect profits and create a reserve.

h.    In or about June 2014, BECKER and BREIER, caused two new Sham Merchant Account applications to be submitted to the New York ISO, for processing by Processor-1 and Bank-1 (the "June 2014 Sham Merchant Accounts"). Like the prior sham merchant applications, these applications contained material misrepresentations about (1) the identity of the true merchant, (2) the nature of the business the merchant was engaged in, and (3) details about the site of the merchant's business and its employees, among other things.

i.    Between in or about June 2014 and on or about October 20, 2014, when Payment Processor-1 terminated the last Sham Merchant Account's ability to process new sales, more than $1.6 million was processed through the June 2014 Sham Merchant Accounts, for sales made by Telemarketer-1.

j.    On or about October 20, 2014, Bank-1 processed a sale of $1,495 through Sham Merchant Account-21.

(Title 18, United States Code, Section 371.)

20

## COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

30. From at least in or about 2012 through at least in or about 2015, in the Southern District of New York and elsewhere, BRANDON BECKER and STEVEN BREIER, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BECKER and BREIER engaged in a scheme to falsify merchant applications and create sham merchant accounts to obtain payment card processing services and to obtain more than $19 million from Bank-1, which scheme involved the use of interstate wires, including interstate wires into and out of the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

21

## COUNT FOUR
### (Bank Fraud)

The Grand Jury further charges:

31. From at least in or about 2012 through at least in or about 2015, in the Southern District of New York and elsewhere, BRANDON BECKER and STEVEN BREIER, the defendants, and others known and unknown, did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, BECKER and BREIER engaged in a scheme to falsify merchant applications and create sham merchant accounts to obtain payment card processing services and to obtain more than $19 million from Bank-1.

(Title 18, United States Code, Sections 1344 and 2.)

### FORFEITURE ALLEGATION

32. As a result of committing the offenses alleged in Counts One, Two, Three, and Four of this Indictment, BRANDON BECKER and STEVEN BREIER, the defendants, shall forfeit to the United States, pursuant to Title 18, United

22

States Code, Section 982(a)(2)(A), any and all property

constituting or derived from, proceeds obtained directly or

indirectly, as a result of the commission of said offenses,

including but not limited to a sum of money in United States

currency, representing proceeds traceable to the commission of

said offenses.

### Substitute Asset Provision

33. If any of the above-described forfeitable

property, as a result of any act or omission of BRANDON BECKER

or STEVEN BREIER, the defendants:

(1) cannot be located upon the exercise of due

diligence;

(2) has been transferred or sold to, or

deposited with, a third person;

(3) has been placed beyond the jurisdiction of

the Court;

(4) has been substantially diminished in value;

or

(5) has been commingled with other property

which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p) and Title 28, United States

23

Code, Section 2461(c), to seek forfeiture of any other

property of the defendant up to the value of the above

forfeitable property.

> (Title 18, United States Code, Sections 982,
> Title 21, United States Code, Section 853, and
> Title 28, United States Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

24

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**BRANDON BECKER and STEVEN BREIER**

**Defendants.**

**SEALED INDICTMENT**

S2 19 Cr. 704 (LAP)

(Title 18, United States Code, Sections
2, 371, 1343, 1344 & 1349.)

GEOFFREY S. BERMAN
United States Attorney.

Sealed Indictment + Arrest Warrant
filed 10/10/19

USMJ Wang