UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                                    19 Cr. 704 (LAP)

       - against -


BRANDON BECKER,


               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


### DEFENDANT BRANDON BECKER'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE*

RICHARD J. MA, ESQ.
20 Vesey Street, Suite 400
New York, New York 10007
Tel: (212) 542-3860
richardma@maparklaw.com

ANTHONY CECUTTI, ESQ.
217 Broadway, Suite 707
New York, New York 10007
Tel: (212) 619-3730
anthonycecutti@gmail.com

KESTINE M. THIELE, ESQ.
217 Broadway, Suite 707
New York, New York 10007
Tel: (212) 542-3460
kestine@kthielelaw.com

*Attorneys for Brandon Becker*

## PRELIMINARY STATEMENT

This memorandum is submitted in opposition to the government's motions *in limine*, seeking: (1) the admission of evidence that Mr. Becker used straw owners for multiple clients in addition to E.M. Systems ("EMS"); (2) the admission of Mr. Becker's and a co-conspirator's alleged threats to a testifying co-conspirator; (3) the preclusion of evidence that Mr. Becker and CardReady, LLC ("CardReady") engaged in lawful business; (4) the preclusion of evidence of interposing payments or acceptance of claims by First Pay Solutions LLC ("First Pay"), First Data Merchant Services LLC ("First Data"), and Wells Fargo Bank, N.A. ("Wells Fargo"); (5) the preclusion of evidence that victim-consumers have been made whole through litigation initiated by the Federal Trade Commission ("FTC"); (6) the preclusion of evidence concerning commonality of similar misconduct by others in the credit card industry; and (7) the preclusion of evidence not produced prior to trial.

We respectfully request leave to supplement our response to the government's motions *in limine* following the government's full production of 3500 materials.

## I.     The Court Should Deny Government Motions *in Limine* I and II, and Preclude the Introduction of "Other Acts" Evidence

The government seeks to introduce evidence of the following alleged prior bad acts: (i) that Mr. Becker used straw owners for multiple clients, in addition to EMS; and (ii) that Mr. Becker and a co-conspirator allegedly made threats to a testifying co-conspirator. For the following reasons, this Court should deny the government from introducing such evidence.

### A.  *Applicable Law*

In conspiracy cases, "the government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir. 1983). Accordingly, the uncharged criminal activity does not fall within the

purview of Federal Rule 404(b), "if it arose out of the same transaction or series of transactions as the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).  Where "it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *United States v. Townsend,* 2007 U.S. Dist. LEXIS 32639, 2007 WL 1288597, at *1 (S.D.N.Y. May 1, 2007) *aff'd United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009).

Where uncharged criminal activity does not satisfy the standard described in *Carboni*, to be admissible it must meet the requirements under Rule 404(b), which provides that: "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  In *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988), the Supreme Court discussed the four prerequisites for admitting other "bad act" evidence must: (i) be offered for a proper purpose as defined in Rule 404(b); (ii) be relevant; (iii) its probative value must outweigh its prejudicial effect under Rule 403; and (iv) the trial court must, upon request, instruct the jury to consider the evidence only for its limited purpose.  *See also, United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988).

While taking an "inclusionary approach" to 404(b) evidence (*see United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)), the Second Circuit has nevertheless repeatedly warned trial courts that, in determining the admissibility of prior bad acts, "caution and judgment are called for." *United States v. Mohel*, 604 F.2d 748, 751 (2d Cir. 1979); *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1970); *see also, United States v. Colon,* 880 F.2d 650, 656 (2d Cir. 1989). Additionally, this "inclusionary" approach "does not invite the government to offer, carte blanche,

any prior act of the defendant in the same category of crime." *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (holding that evidence of prior convictions was "propensity evidence in sheep's clothing"); *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). Of critical importance, "uncharged" crimes evidence cannot be introduced to show a defendant's criminal propensity. *See Huddleston*, 485 U.S. 681 (1988); *United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012).

Should a court find that the first two prongs of *Huddleston* are satisfied, the court must then decide whether the probative value of the "uncharged bad act" evidence is substantially outweighed by the danger of unfair prejudice. As the Supreme Court set forth in *Old Chief v. United States*, 519 U.S. 172 (1997), "unfair prejudice" is an "undue tendency to suggest decision on an improper basis," and invokes, as an example, a jury's "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)." 519 U.S. at 180-81. The Second Circuit has instructed that the probative-prejudice balancing analysis demands "particularly searching, conscientious scrutiny" in the context of prior crimes evidence because such evidence poses a severe risk of unfair prejudice. *McCollum*, 584 F.3d at 476. Indeed, when conducting this balancing, the trial court must remain attentive to the potential for "undermin[ing] the fairness of the trial" with "classic, and powerful, evidence of propensity." *Id.* at 477.

In this case, evidence of "uncharged bad acts" merits "particularly searching, conscientious scrutiny." Such evidence easily lends itself to generalized reasoning about a defendant's criminal propensity and undermines his presumption of innocence. Despite the most careful instructions from the court, jurors are likely to believe that because of such "uncharged bad act" evidence, there

is a high probability that the defendant is guilty of the offenses for which he is on trial.  *See* 1A Wigmore, Evidence § 58.2 (Tillers rev. 1983) (stating that, where prior crimes evidence is adduced, "[t]he natural and inevitable tendency of the tribunal…is to give excessive weight to the vicious record of crime thus exhibited and either allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge").

Accordingly, "uncharged bad acts" should not be admitted unless a trial court has carefully conducted the Rule 403 balancing test required by *Huddleston*.  *See, e.g., United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1988) ("To avoid acting arbitrarily, the district court must make a 'conscientious assessment' of whether unfair prejudice substantially outweighs probative value." (quoting *United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982)); *United States v. Williams*, 596 F.2d 44, 51 (2d Cir. 1979) ("District judges must carefully scrutinize both the basis for the claimed relevance of [prior crimes] evidence and the balance between its probative value and prejudicial effect.  The key to a fair trial in such cases is careful determination by the trial judge of both issues, particularly the latter.").

As is true for all evidence, uncharged criminal activity, to be properly admitted, must satisfy Federal Rule of Evidence 403.  Rule 403 excludes otherwise relevant evidence if "the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  The district court has broad discretion in considering the exclusion of prior bad act evidence pursuant to this rule.  *See United States v. Gilan*, 967 F.2d 776, 780 (2d Cir. 1992).

In the context of this rule, "[t]he term 'unfair prejudice' as to a criminal defendant speaks

to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180 (1997). In other words, "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly though not necessarily, an emotional one." *Id.* (*citing* Advisory Committee Notes on Fed. R. Evid. 403, 28 U.S.C. App. p. 860).

It is axiomatic that propensity – or "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged" – constitutes one such improper basis for admission. *Old Chief*, 519 U.S. at 180; *see also* Fed. R. Evid. 404(b) (prohibiting the admission of evidence of "other crimes, wrongs or acts to prove the character of a person in order to show action in conformity therewith"). Further, the risk that evidence will be so misused is at its highest when the prior bad act is the same, or very similar, to the bad acts alleged against the defendant in the current indictment. *See, e.g., United States v. Gotti,* 399 F. Supp. 2d 417 (S.D.N.Y. 2005) (excluding evidence of uncharged, 20-year-old murder when defendant on trial for double homicide and two attempted murders).

Further, any probative value of such evidence is diminished by the existence of other, less prejudicial means of proving the same point. In *Old Chief*, the Supreme Court specified that once the district court had determined that some evidence of a prior bad act raised the danger of unfair prejudice, the court should then "evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substances as well [because] a judge applying 403 could reasonably apply some discount to the probative value of an item when faced with less risky alternative proof going to the same point." *Id.* at 182-83; *accord Gotti*, 399 F. Supp. 2d at 419 ("probative value of [prior bad act] evidence is undercut by the availability of other, less prejudicial evidence that makes the same point"); *United States v. Nachamie*, 101 F. Supp. 2d 134,

142 (S.D.N.Y. 2000).

As set forth below, none of the government's proffered evidence of prior uncharged crimes and bad acts satisfy the first two prongs of the *Huddleston* analysis; they are not offered for any proper purpose delineated in Rule 404(b)(2), and they are not relevant.  Alternatively, even assuming *arguendo* that the proffered evidence satisfies the first two *Huddleston* prongs, the probative value of said evidence in each instance is substantially outweighed by prejudicial effect.

### B.  The Government's Proffered Evidence that Mr. Becker and CardReady Used False Signers and Sham Companies for CardReady Customers Should Be Excluded

The government argues that evidence that Mr. Becker and CardReady extensively used alleged sham merchant accounts to process payment-card transactions for other CardReady customers, in addition to EMS, is direct evidence of his participation in the charged conspiracy because such conduct is background evidence inextricably intertwined with the charged crimes.  Alternatively, the government argues that such evidence is also admissible as probative of preparation, intent, absence of mistake or lack of accident under Rule 404(b).  For the following reasons, these arguments should be rejected.   This highly prejudicial and unreliable evidence is only offered to denigrate the defendant and distract the jury by showing bad character and criminal proclivity.

Contrary to the government's assertion, evidence that CardReady and Mr. Becker allegedly used fake companies for CardReady customers other than EMS is not direct proof of the charged conspiracy.  This is because the issue to be resolved at trial is straightforward: whether the government proved beyond a reasonable doubt that Mr. Becker participated in a conspiracy to help EMS obtain credit card payment processing by creating sham companies and submitting falsified merchant account applications.  To that end, whether Mr. Becker and CardReady used fake com-

panies for *other* CardReady customers is wholly irrelevant and extraneous, especially those instances that allegedly occurred after the period charged in the indictment.  The proffered evidence has nothing to do with the government's allegations with respect to EMS.  That CardReady allegedly created fake companies and submitted falsified paperwork for other customers cannot be said to have arisen "out of the same transaction or series of transactions as the charged offense," is not "inextricably intertwined with the evidence regarding the charged offense," and "is not necessary to complete the story of the crime on trial."  *Carboni*, 204 F.3d at 44.  The evidence that the government seeks to present is evidence of transactions that are unquestionably separate and distinct from the charged crimes and must be precluded.

The Court must also reject the government's argument that this evidence is admissible as background and relationship evidence.  Certainly, evidence of prior bad acts may be used under certain circumstances to provide background information and to assist a jury in understanding relationships of mutual trust.  *See United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996).  However, such prior bad acts must be relevant to and address an aspect of the background or relationships that are at issue.  *United States v. Mercado*, 573 F.3d 138, 144 (2d Cir. 2009) (Droney, D.J., dissenting).  Here, the proffered prior bad acts evidence does not address any disputed aspect of the relationships underlying the alleged conspiracy.

Importantly, the government's cooperator testimony, if accepted, would suffice to convict on the charged crimes without the terribly prejudicial evidence of what is tantamount to a pattern of criminal behavior.  The government does not need evidence that CardReady and Mr. Becker allegedly used fake companies for CardReady customers other than EMS.  As such, the evidence is not admissible as direct evidence for the purpose of providing background information and must be subject to Rule 404(b) analysis.

This evidence is "other crimes/acts" evidence.  If it is admissible, it can only be so, if at all, pursuant to Rule 404(b), and must be analyzed under the prongs in *Huddleston*, in particular, the 403 balancing test.  While the government proffers preparation, intent, absence of mistake and lack of accident for the admission of such evidence, the evidence is of minimal probative value to the charged crime.  On the other side of the scale, the danger of unfair prejudice is high.  The government's proffered evidence is essentially evidence of a pattern of repeated criminal conduct, and prejudice stemming from the admission of such evidence would substantially outweigh its minimal probative value.  Accordingly, such evidence should be excluded.

There are no legally relevant or material issues for which evidence that CardReady and Mr. Becker allegedly used fake companies for CardReady customers other than EMS is probative.  To be admissible, evidence of prior bad acts must be relevant to an issue in dispute at trial.  *United States v. Scott*, 677 F.3d 72, 81 (2d Cir. 2012).  Preparation, intent, absence of mistake and lack of accident — the purposes proffered by the government — are not issues in dispute that are addressed by the evidence.  Indeed, the government cannot identify any disputed issue to which any aspect of the evidence is relevant.  Thus, the prosecution's proffered uncharged crime evidence is not relevant to any material issue and the only real effect of introducing the evidence is to draw the impermissible inferences of bad character and criminal propensity.

Even assuming *arguendo* that the proffered evidence is probative of a relevant issue, the potential for prejudice far outweighs any probative value.  Such evidence is highly prejudicial and would induce a jury to convict on collateral matters such as the defendant's other alleged bad acts, rather than actual evidence of guilt adduced by the government.  The jury will perceive a criminal bent.  Moreover, the jury would likely convict to impose punishment for the uncharged acts.  As such, the Court must exclude this evidence.

In the instant matter, the cumulative effect of the proffered evidence from multiple witnesses, documents and other forms of evidence would mislead the jury.  The jury would overestimate the significance of the evidence of uncharged crimes.  At the very least, the jury would face confusion over facts and charged crimes.  Moreover, the potential for prejudice will be exacerbated by the repeated presentation of bad act evidence through multiple witnesses.  No degree of care or precautionary instruction would minimize the immense prejudice of such evidence.

The primary duty of the jury in this case will be to determine whether the evidence describing the acts charged is credible.  The allegations concerning uncharged crimes do not in any way render the central testimony pertaining to the charged crime more persuasive.  The danger of unfair prejudice resulting from uncharged crime evidence is clear and the case law shows that this Court can and should avoid the danger of prejudice by precluding the evidence so that the jury will not be distracted from its sole purpose: to determine guilt or innocence based solely on the facts appropriate for that determination.

### C.  The Government's Proffered Evidence of Mr. Becker's and a Co-conspirator's Threats to a Testifying Co-conspirator Should Be Excluded

The government moves to introduce evidence of threats allegedly made by Mr. Becker and alleged co-conspirator Farid Shayegh against a testifying cooperator ("CW-1").  The government argues that the evidence of threats should be admitted pursuant to Rule 404(b) as proof of consciousness of guilt, or as direct evidence of state of mind.  The Court should not be persuaded.  The government seeks to overwhelm the jury with collateral evidence of bad character to unduly and inappropriately influence them.  This evidence must be excluded as it is not inextricably intertwined with the facts of this case, and the probative value is substantially outweighed by its prejudicial effect.

First, the proffered evidence of threats cannot be admitted as direct evidence because it did

not arise "out of the same transaction or series of transactions as the charged offense," is not "in-extricably intertwined with the evidence regarding the charged offense," and is not "necessary to complete the story of the crime on trial." *See Carboni*, 204 F.3d at 44.  While the proffered evidence would tend to show that Mr. Becker was upset, angry and made unrealized and idle threats to CW-1, such evidence would not help the jury in understanding the charged crime.  It is not crucial information without which the jury will be confused.

Quite the contrary, the proffered evidence will lead to a trial-within-a-trial, as Mr. Becker will essentially be required to defend himself against a highly inflammatory second set of accusations.  This will naturally lead to juror speculation and confusion of facts and issues.  The jury, upon review of this highly prejudicial evidence, will be inclined to convict based upon perceived bad character, violent tendency and criminal propensity.  In addition, the government's theory of the case will not be unfairly limited if such evidence is excluded.  Rather, it is evidence that must come in, if at all, pursuant to Rule 404(b) analysis under the prongs in *Huddleston*, and in particular, the Rule 403 balancing test.

Notably, consciousness of guilt is not a proper purpose because there is no nexus between the alleged threat and consciousness of guilt of the charged crime.  A "satisfactory factual predicate must exist from which the jury can infer consciousness of guilt." *United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005) (Second Circuit held that District Court wrongly admitted evidence of defendant's wife's efforts to obtain tickets and passports months after defendant knew he was heavily implicated in currency smuggling, since wife's efforts were too attenuated to establish that defendant intended to flee to avoid prosecution or apprehension.).  In the context of Mr. Becker, there is significant attenuation between the government's evidence and its proffered purpose.  The unsubstantiated, speculative and incendiary evidence that Mr. Becker was upset or angry at CW-

1 is not a predicate from which the jury can infer consciousness of guilt.  Mr. Becker's alleged threat is therefore clearly attenuated and distinct from the facts of the instant case.  The proffered evidence of threats is not probative as to whether Mr. Becker participated in a conspiracy to assist EMS in obtaining credit card payment processing by creating sham companies and submitting falsified merchant account applications.  Thus, the prosecution's proffered uncharged crime evidence is not relevant to any material issue and its only real effect would be influencing the jury to draw impermissible inferences of bad character and criminal proclivity.

Nevertheless, even assuming *arguendo* that the proffered evidence is probative of a relevant issue, the potential for prejudice far outweighs any probative value.  Such evidence — which, upon information and belief, will include incendiary testimony of (ultimately idle) threats; the unrelated and unsubstantiated acts of a third-party (Farid Shayegh); and that the CW-1 considered the purchase of a gun — is highly inflammatory and would induce a jury to convict on collateral matters and for the defendant's other alleged bad acts, rather than actual evidence of guilt adduced by the government.  The jury will perceive a criminal propensity.  As such, the Court must exclude evidence of the alleged threats.

In the instant matter, the jury would overestimate the significance of the evidence of uncharged crimes.  At the very least, the jury would face confusion over facts and charged crimes.  Moreover, the potential for prejudice will be exacerbated by the repeated presentation of bad act evidence through multiple witnesses.  No degree of care or precautionary instruction would minimize the immense prejudice of such evidence.

The primary duty of the jury in this case will be to determine whether the evidence describing the acts charged is credible.  The allegations concerning uncharged crimes do not in any way render the central testimony pertaining to the charged crimes more persuasive.  The danger of

unfair prejudice resulting from uncharged crime evidence is clear and the case law shows that this Court can and should avoid the danger of prejudice by precluding the evidence so that the jury will not be distracted from its sole purpose: to determine guilt or innocence of fraud based solely on the facts appropriate for that determination.

## II.   The Government's Blanket Motions *in Limine* III and IV Are Overbroad and Infringe on Mr. Becker's Constitutional Rights, and Therefore, Should be Denied

### A.   *Applicable Law*

It is well-settled law that a criminal defendant is entitled by the Constitution to a meaningful opportunity to present a complete defense.  In *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), the Supreme Court held that evidentiary rules "may not be applied mechanistically" to exclude evidence that: 1) bears "persuasive assurances of trustworthiness"; and 2) is critical to a defendant's defense.  *Id.* at 302.  Of course, the right to confront and cross-examine is not absolute and may, in appropriate cases, bow to accommodate other interests in the criminal trial process.  *Id.* at 295 (*citing Mancusi v. Stubbs*, 408 U.S. 204 (1972)).  But its denial or significant diminution calls into question the ultimate "integrity of the fact-finding process" and requires that the competing interest be closely examined.  *Id.*  (*citing Berger v. California*, 393 U.S. 314, 315 (1969)).  Secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment, a person's right to be heard in his defense – a right to his day in court – is basic in our system of jurisprudence.  *Id.* at 294-295.  *See also Morrissey v. Brewer*, 408 U.S. 471, 488-489 (1982); *Jenkins v. McKeithen*, 395 U.S. 411, 428-429 (1969); *Specht v. Patterson*, 386 U.S. 605, 610 (1967); *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001) (*citing* Supreme Court cases).

The Second Circuit has recognized that the critical element in a fraud case is the mental state of the defendant.  *See United States v. Leonard*, 524 F.2d 1076, 1091 (2d Cir. 1975), cert.

denied, 425 U.S. 958, 96 S. Ct. 1737, 48 L. Ed. 2d 202 (1976).  Circuits have repeatedly observed

that in such cases, the "accused as part of his defense is entitled to wide latitude in the introduction

of evidence which tends to show lack of specific intent."  *United States v. Sternstein*, 596 F.2d

528, 530 (2d Cir. 1979); *see also* United *States v. Brown*, 411 F.2d 1134, 1137 (10th Cir. 1969)

("In a case such as this where the element of willfulness is critical to the defense, the defendant is

entitled to wide latitude."); *accord*, *Black v. United States*, 309 F.2d 331, 337 (8th Cir. 1962); *see*

*Haigler v. United States*, 172 F.2d 986, 987 (10th Cir. 1949).  *Cf. Bullard v. United States*, 395

F.2d 658, 660 (5th Cir. 1968); *Ehrlich v. United States*, 238 F.2d 481, 484 (5th Cir. 1956).  Evi-

dence on the question of intent, where that is material, may take a wider range than is allowed in

support of other issues.

> In *Mallette v. Scully*, 752 F.2d 26 (2d Cir. 1984), the Second Circuit explained:

> To show intent the government must prove what was in the mind of the accused.
> Commentators agree that it is seldom possible to present testimonial or direct evi-
> dence of an accused's state of mind.  Intent as a separate item of proof does not
> commonly exist.  Thus, whenever intent is an element of a crime, its existence must
> be inferred by considering the laws that generally govern human conduct.  Because
> intent is formed in the mind in secrecy and silence and the human mind functions
> at a speed impossible to measure, a determination of whether a deliberate intent
> was formed must be drawn from all the circumstances of the case.  Circumstantial
> evidence of this subjective fact is therefore indispensable.  Circumstantial evidence
> is as persuasive as direct evidence.  With each, triers of fact must use their experi-
> ence with people and events to weigh probabilities.

*Id.* at 32 (citations omitted); *accord*, *e.g.*, *Fernandez v. Dufrain*, 11 F. Supp. 2d 407, 417 (S.D.N.Y.

1998); *see also*, *e.g.*, *United States v. Kwong*, 14 F.3d 189, 194 (2d Cir. 1994) ("By necessity,

intent must usually be proved by circumstantial evidence."); *Fratarcangelo v. Smith*, 792 F.2d 40,

43 (2d Cir. 1986) ('intent may be inferred and need not be proved by the defendant's own state-

ment, which is a correct statement of the law.").

**B.  Mr. Becker Should Be Permitted to Admit Evidence Concerning CardReady's Preparation and Submission of Legitimate Merchant Applications for the Limited Purpose of Showing Lack of Knowledge**

In its third motion *in limine*, the government seeks to preclude Mr. Becker from arguing, eliciting on cross-examination, or offering evidence at trial that, with respect to clients other than EMS, CardReady submitted legitimate merchant applications.  The government argues that such "good acts" evidence is not probative of the narrower issues at trial and will only serve to confuse or mislead the jury and should be precluded.  This blanket motion should be denied, in part.

It is well-settled law that "[a] defendant may not seek to establish his innocence…through proof of the absence of criminal acts on specific actions."  *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) (summary order) (quoting *Untied States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990)).  Because the government seeks to wholly preclude Mr. Becker from adducing evidence of legitimate clients and applications, its motion is plainly overbroad and prejudicial. The jury is free to infer lack of intent, mistake or accident.  Evidence that CardReady engaged in lawful conduct is not only factual, but relevant to these defenses.

In its motion, the government cites *United States v. Damti*, 109 F. App'x 454, 455-56 (2d Cir. 2004) (summary order), where the Second Circuit noted that while evidence of past "good acts" by a defendant is generally not probative, it may be if a defendant is alleged to have "always" or "continuously" committed "bad acts."  Though the government states that it will not allege Mr. Becker engaged in "ceaseless" criminal conduct, the evidence it seeks to include and preclude at trial undoubtedly paints the picture that CardReady was permeated with fraud.  A number of its motions *in limine* indicate an intent to cherry-pick evidence and leave out necessary context.  The government should not be permitted to inappropriately monopolize the evidence, foreclosing the opportunity for Mr. Becker to present a meaningful and complete defense.

15

This type of evidence — that CardReady engaged in lawful business — is essential to Mr. Becker's defense, as it is probative of the central issue at trial, Mr. Becker's intent. Mr. Becker was de jure CEO of CardReady before and during the alleged conspiracy period. Likewise, most of his alleged co-conspirators worked with or for the company in some capacity before and during that period. Mr. Becker's knowledge surrounding the legitimate business practices of CardReady's employees and contractors is highly probative of his knowledge of the charged scheme. It is only with the presentation of evidence regarding CardReady's history in the credit card processing industry and Mr. Becker's relationships with and trust in his alleged co-conspirators that the jury can come to a fair, undistorted conclusion about Mr. Becker's knowledge of and involvement in the alleged EMS scheme. Precluding evidence that CardReady and its employees or contractors operated lawfully on certain instances would mislead the jury to infer that at the company's inception, its sole purpose and Mr. Becker's sole intention was to defraud.

*United States v. Sternstein*, 596 F2d 528 (2d Cir. 1979), is a guiding Second Circuit case. *Sternstein* involved the prosecution of an accountant for aiding and assisting in the preparation of false or fraudulent income tax returns for his clients. Sternstein did not deny the preparation of the returns, or that certain of them had been subsequently audited and further taxes levied. His defense was that any erroneous deductions claimed were the result of inadvertence, and not because of any criminal intent. That defense prompted the district judge to observe that the "mental state of the defendant" constituted the "critical element" in the case. The government's explanation of Sternstein's motive to falsify the returns despite his flat fee was that the bogus deductions were part of a scheme to generate new business by gaining inflated returns for his clients. Rebuttal of this contention by demonstrating that he produced no such illegal windfall for the overwhelming majority of his clients was unquestionably crucial to Sternstein's position that the few false returns

were innocently prepared by him.  The importance of this evidence was underscored by the district court's admitting into evidence, over the government's objection, the testimony of three clients of Sternstein whose returns had been audited and were found to be proper.  *Id.*

The "accused as part of his defense is entitled to wide latitude in the introduction of evidence which tends to show lack of specific intent."  *Id.* at 530.  There are similar facts in this case. Mr. Becker's knowledge that CardReady and its agents engaged in non-deceptive, lawful business practices goes directly to his knowledge of the crimes charged here.  The government will have ample opportunity to present any evidence that Mr. Becker had knowledge of the alleged scheme. Mr. Becker too should have ample opportunity, as Mr. Sternstein did, to present or elicit on cross-examination evidence that tends to negate his knowledge.  Any effort by the government to prohibit Mr. Becker from presenting such evidence is a deliberate attempt to manipulate the facts.

A jury is capable of distinguishing CardReady's lawful conduct from alleged unlawful conduct, and the argument that evidence of lawful conduct would confuse should be viewed with skepticism.  If the government believes it has strong evidence of CardReady's alleged submission of false information on merchant applications, evidence of the company's submission of truthful applications at any point will not negate that.  It is critical to Mr. Becker's defense, though, that he be permitted to offer evidence about what he knew or did not know other employees or contractors at CardReady to be doing.  His intent is directly informed by how he understood CardReady and his alleged co-conspirators to operate with regard to the merchant applications, not only before the conspiracy period, but during.

Federal Rule of Evidence 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401. To be relevant, evidence need not constitute conclusive proof of a fact in issue, but only have "any

tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without evidence." *McKoy v. North Carolina,* 494 U.S. 433, 440 (1990) (*quoting New Jersey v. T.L.O.*, 469 U.S. 325, 345, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985)); *see also United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010).  Rule 401 sets a "very low standard for relevance." *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008).  The Court's determination of what constitutes "relevant" evidence is guided by the nature of the claims and defense presented.  *United States v. Shkreli*, 2017 U.S. Dist. LEXIS 145215, at *5 (E.D.N.Y. June 24, 2017, No. 15-CR-637 (KAM)).  While not conclusive proof of a fact at issue, evidence of truthful merchant applications submitted by CardReady is relevant to this trial's critical issue, as it is background information tending to show Mr. Becker's lack of intent.  As such, it cannot be precluded without violating Mr. Becker's right to be heard in his defense.

### C.  Mr. Becker Should Be Permitted to Admit Evidence Concerning The Processing Entities' Acceptance of EMS-Related Merchant Applications for the Limited Purpose of Showing Lack of Knowledge

In its fourth motion *in limine*, the government seeks to preclude Mr. Becker from interposing as a defense the fact that First Pay, First Data and/or Wells Fargo (collectively, the "Processing Entities") accepted each of the 26 fraudulent merchant applications and processed consumers' payments through them.  Specifically, the government moves to preclude Mr. Becker from engaging in "victim-blaming," by arguing that he lacked fraudulent intent because the payment processors accepted and processed these merchants.  This overbroad motion should be denied, in part. Indeed, "an innocent crime victim has no duty to detect a crime being perpetrating against it." *United States v. Holland*, 394 F. App'x 766, 768 (2d Cir. 2010) (summary order).  We will not argue that there could be no fraud if the Processing Entities were negligent or objectively unreasonable.  The defense will not argue that the Processing Entities' failure to take steps to prevent

fraud in and of itself negates the existence of fraudulent conduct.  But, we must be permitted to argue that the Processing Entities' continued acceptance of both alleged sham and lawful merchant applications throughout the course of the scheme informed Mr. Becker's knowledge and intent.  It is fundamental to Mr. Becker's defense that facts suggesting he had no reason to believe CardReady was engaging in fraudulent activity be presented to the jury.  Our defense has nothing to do with shifting blame to victims, and everything to do with what Mr. Becker knew.  The government proffered no specific caselaw that suggests that particular argument contravenes the law.

As previously discussed at length, the issue of Mr. Becker's knowledge will be squarely before the jury.  Mr. Becker's right to present a meaningful defense protects the truth-finding process.  "The ends of criminal justice would be defeated if judgment were to be founded on a partial or speculative presentation of the facts."  *United States v. Nixon*, 418 U.S. 683, 709, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974)).

Not permitting the jury to hear that during the alleged conspiracy period, the Processing Entities did not sound the alarm, would result in a partial, distorted presentation of the facts.  It is important circumstantial evidence for which it is the fact-finders' duty to weigh, either in favor of Mr. Becker's knowledge of the alleged EMS scheme or his lack of knowledge.  Mr. Becker's de facto role at CardReady at the time of the alleged conspiracy involved minimal supervision from a bird's-eye view.  Even that characterization is generous.  Therefore, an understanding, belief or assumption on Mr. Becker's behalf that First Pay, First Data, and/or Wells Fargo continued to accept CardReady's merchant applications and that CardReady was operating business-as-usual, is essential context for a jury to determine whether he had fraudulent intent.  The government is free to proffer evidence to the contrary.  As the Second Circuit has stated, "Whenever intent is an element of a crime, its existence must be inferred by considering the laws that generally govern

human conduct." *Scully*, 752 F.2d at 32.  A determination of whether deliberate intent was formed in Mr. Becker's mind *must* be drawn from *all* the facts and circumstances of the case, not simply the circumstances the government seeks to admit.  *See id.*  To limit the jury's exposure to vital evidence that goes to Mr. Becker's state of mind is to infringe on Mr. Becker's Constitutional rights and misrepresent what occurred.

This motion is another attempt by the government to bar evidence necessary for Mr. Becker to mount a meaningful defense.  If the Court were to eliminate nearly all relevant, circumstantial facts most probative of Mr. Becker's intent at the time the alleged crimes were committed, what would Mr. Becker be left to defend himself with but his own word?  Under the law, he should have wide latitude to present or elicit on cross-examination evidence tending to show lack of specific intent.  The evidence we seek to include tends to place the government's story in a significantly different light, such that a reasonable jury might receive it differently.  Thus, the government's blanket motion to preclude evidence related to the Processing Entities' acceptance of merchant applications and the processing of payments through them for a period of time should be denied.

III.    **Mr. Becker Does Not Oppose Government Motion *in Limine* VI, But Seeks to Introduce Evidence Concerning the Commonality of Similar *Lawful* Conduct Among Other Actors in the Credit Card Processing Industry**

In its sixth motion *in limine*, the government seeks to preclude Mr. Becker from arguing that he lacked fraudulent intent because it was somehow common in the credit card processing industry to use "signers" or "Independent Business Owners" to open merchant accounts for another business, without actually being involved in that other company's business activity.  Certainly, misconduct by others in the industry is irrelevant and not probative as to Mr. Becker's culpability for the crimes charged.  We have no intention of putting forth the argument that alleged criminal activity by Mr. Becker or CardReady is defensible because "everyone is doing it."

Nevertheless, we notify the Court that Mr. Becker does expect to elicit evidence that there are certain *lawful* practices common among actors in the credit card processing industry and that CardReady engaged in those same practices.  Because the critical issue is Mr. Becker's knowledge, evidence that CardReady used similar methods and patterns as other companies is highly relevant. Assuming *arguendo* that the alleged co-conspirators did in fact engage in deceptive practices by using "fake" signers, from Mr. Becker's viewpoint, they could have appeared to have been engaging in lawful activity.  The fraud alleged in the indictment, to someone outside day-to-day operations, could look deceivingly similar to legitimate business.

CardReady was a sales agent working with and recruiting high-risk merchants for credit card processing accounts on behalf of First Pay.  High-risk businesses are not inherently illegal. There are a number of reasons a merchant may be deemed "high-risk" by a payment processor— having a high transaction volume, accepting international payments, or operating in a high-risk industry, including but not limited to pornography, travel, furniture, health supplements and subscription services.[1]  In the high-risk credit card processing space, it is common for: 1) a merchant account to have high chargeback numbers, 2) a merchant account to be shut down after only a period of months, 3) a sales agent like CardReady to take a larger revenue share to maintain reserves, in the event of unplanned risk events like cardholder disputes, 4) a merchant account to have a relatively low monthly processing limit, as set by the Processing Entities and 5) a merchant creating multiple MIDs ("Merchant Identification Number") to segment its transactions based on criteria like different sales channels, distinct business units, varied currencies or specific geographical regions.  Because these occurrences and practices are commonplace and, most importantly,

---

[1] Dana Miranda, Leeron Hoory & Cassie Bottorff, "Best High-Risk Merchant Account Service Providers of 2023," *Forbes Advisor*, *available at* https://www.forbes.com/advisor/business/best-high-risk-merchant-account-providers/#:~:text=View%20More,What%20Is%20Considered%20a%20High%2DRisk%20Merchant%3F,a%20high%20volume%20of%20returns.

not intrinsically unlawful, Mr. Becker plans to introduce such evidence, tending to prove lack of fraudulent intent, and we do not understand the government to oppose such introduction.

IV.     **Government's Motion *in Limine* VII Concerning Reciprocal Discovery Obligations Pursuant to Rule 16 is Moot**

We are aware of and will continue to comply with our reciprocal discovery obligations in this case, under Federal Rule of Criminal Procedure 16.  At this juncture, we affirm that we have not withheld documents or other discovery that falls within our statutory obligations.  Accordingly, the government's seventh motion *in limine* is moot.

## CONCLUSION

For all of the foregoing reasons, Brandon Becker respectfully requests that this Court deny the government's motions *in limine* for the reasons set forth herein.


Dated: New York, New York
       October  27, 2023


Respectfully submitted,

/s/ Richard J. Ma

RICHARD J. MA
ANTHONY CECUTTI
KESTINE M. THIELE
Counsel for Brandon Becker