```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          19 CR 704 (LAP)

BRANDON BECKER,
                                        Remote Conference
                    Defendant.
------------------------------x
                                        New York, N.Y.
                                        June 12, 2024
                                        10:00 a.m.

Before:

                HON. LORETTA A. PRESKA,

                                        District Judge

                       APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
VLADISLAV VAINBERG
     Assistant United States Attorney

BOBBI C. STERNHEIM
     Attorney for Defendant
     -AND-
FASULO GIORDANO & DIMAGGIO LLP
BY:  MICHAEL EDWARD GIORDANO
```

1               (The Court and parties present via video)
2               THE COURT:  Good morning, ladies and gentlemen.
3               MS. STERNHEIM:  Good morning, Judge Preska.
4               MR. VAINBERG:  Good morning, your Honor.
5               MR. GIORDANO:  Good morning, your Honor.
6               THE COURT:  How are you?
7               MR. VAINBERG:  I'm doing well.  Thank you.
8               THE COURT:  Okay, friends.  Have you had any
9    additional time -- is the court reporter on?
10              (Pause)
11              THE COURT:  Thank you so much.
12              Have you folks had any additional conversations since
13   your letters?
14              MR. GIORDANO:  This is Michael -- sorry, Vlad.
15              MR. VAINBERG:  Your Honor, this is AUSA Vlad Vainberg.
16              We have not.  Particularly since there was one more
17   letter that the defense put in after 5:00 p.m. yesterday, so we
18   haven't spoken substantively.
19              THE COURT:  Okay.
20              And, Mr. Giordano, I don't know if you put the letter
21   in or whatever happened, but it was a lesson for my interns not
22   to put in a substantive letter with lots and lots of
23   attachments after 5:00 p.m.  We read it, have it onboard, but
24   it's perhaps not the best practice.
25              MR. GIORDANO:  Yes, your Honor.  Understood.

O6CKBECC

1            THE COURT:  All right.
2            Let me ask you this:  Mr. Becker, you understand,
3  don't you, that you have the right to be present in court with
4  the judge and all the lawyers in New York, right?
5            You're muted, sir.
6            You're still muted.
7            MS. STERNHEIM:  We can't hear you.
8            THE COURT:  Unmute.
9            THE DEFENDANT:  Is that working?
10            Yes, your Honor, I do understand that.  Thank you.
11            THE COURT:  Okay.
12            Do I correctly understand that in this instance,
13  today, you've decided to waive that right in order to avoid the
14  aggravation of flying to New York and flying back to
15  California?  Is that right?
16            THE DEFENDANT:  Yes, your Honor, that is correct.
17            THE COURT:  And you did that after consulting with
18  your lawyers, correct?
19            THE DEFENDANT:  Yes, I did.
20            THE COURT:  Counsel, is there anything else you want
21  me to ask Mr. Becker on this topic?
22            MR. VAINBERG:  Not from the government, your Honor.
23            MR. GIORDANO:  Not from the defense, your Honor.
24            THE COURT:  Thank you.
25            I find that Mr. Becker has knowingly and voluntarily

1   waived his right to be present in court today.

2   May I ask the government why we think that at this
3   point, knowing what we know now, we need to impose home
4   confinement and the like on Mr. Becker? And I do note that,
5   apparently, the supervising pretrial officer in California has
6   recommended that the home confinement be discontinued.

7   MR. VAINBERG: So, your Honor, obviously, prior to the
8   incident that caused the disqualification of former counsel, in
9   which Mr. Becker set up that interview, he was not on home
10  confinement. That is a new condition, we think correctly added
11  by your court, in response to that bail violation. We
12  understand the argument that it's now been six months or so
13  since that time, and so the government's view is that if your
14  Honor feels that that is sort of an appropriate amount of time
15  to remove that condition, but to continue to impose all other
16  conditions, including electronic monitoring, to permit
17  Mr. Becker to travel for a new job, the government is fine with
18  that.

19  THE COURT: Okay.

20  Mr. Giordano, I don't understand fully what the issue
21  is with the electronic monitoring. I don't go to trade shows
22  and conferences, but I'm not so sure I'm familiar with, say,
23  walking through a metal detector or what.

24  MR. GIORDANO: Yes, your Honor. I think there are two
25  really practical considerations.

1        The first is that, given the nature of the business,
2   being in the aerospace/defense industries, that these
3   conferences have enhanced security.  That's not to say that
4   perhaps there couldn't be arrangements made in advance where
5   Mr. Becker could gain entry to them or they could be made aware
6   of this.  We just don't know — every show is different, and
7   every conference is different — whether any particular show, it
8   would be a bar for him to gain entry with the electronic
9   monitor.
10       Now, obviously, people have knee replacements and
11  different things that make it difficult to go through security,
12  and we have ways of dealing with those.  I just can't say, as
13  it stands, that the electronic monitor would be a barrier for
14  him to gain entry and that being a principal role in this job
15  opportunity.
16       And, second, I think --
17       THE COURT:  I didn't understand the first one.
18       MR. GIORDANO:  So if there are metal detectors --
19       THE COURT:  How do we know that there are?
20       THE DEFENDANT:  Judge -- may I interject, Michael,
21  Mr. Giordano?
22       MR. GIORDANO:  Briefly, yes.
23       THE DEFENDANT:  Yes, it's not just trade shows, it's
24  going to Lockheed Martin secured areas as well, and getting
25  padded down and explaining the entire process of my prosecution

when I'm just there to really help them with their imaging of their aircraft and helping them sell products to governments or private companies.

So it's not just trade shows. It's going to offices, corporate offices, secured areas, along with the trade shows, is the primary reason for travel, but I do have to travel places like that as well.

Excuse me. Thank you very much for your time.

THE COURT: Okay.

Mr. Giordano, I think you mentioned in your letter your view that there were other ways that pretrial services could keep tabs on Mr. Becker other than the ankle bracelet. I wasn't quite sure what those were about.

MR. GIORDANO: So my understanding is that previously, the Central District of California — and I'm just grabbing the name of it — had recommended the use of maybe SmartLINK, I believe it's called, and I am just getting the name of it. It's a method they use that is a phone application that gives realtime location monitoring. I believe that had been rejected by the Southern District, but California is the monitoring district, and if it's a method that they use, and is approved by the court and by pretrial, I don't think the Southern District's position, if it is still their position, that they don't recognize that use of that application as a form of monitoring should be a barrier, because California is the

1   district that monitors him.  And we'd be happy to make

2   Mr. Becker available or conference with pretrial in the Central

3   District of California to better understand the practical

4   implications of it and if it's a viable alternative.

5            THE COURT:  So -- wait.

6            MS. STERNHEIM:  Judge --

7            THE COURT:  Oh, Ms. Sternheim?

8            MS. STERNHEIM:  Hello, Judge.

9            THE COURT:  Good morning.

10           MS. STERNHEIM:  I just wanted to make a short point on

11  that.

12           The SmartLINK system, as I understand it, has a much

13  larger range.  The Southern District of New York is very small

14  compared to the Central District of California, and, whereas,

15  here, we sometimes run into issues where a defendant's location

16  would exceed the capabilities of electronic monitoring, the

17  SmartLINK system is broader, and I believe that is why it is

18  used in certain districts.  It may not yet be used here — maybe

19  it's something that will be used in the future — but it is

20  something that is used more widely in districts that have

21  larger geographical distances.

22           THE COURT:  And, Ms. Sternheim, do you know if it is

23  nationwide?

24           MS. STERNHEIM:  That, I do not know.  And certainly

25  any questions the Court has, we will seek answers.  And if the

1   Court feels it appropriate to have the monitoring officer
2   available — it's a little early there now, so we couldn't do
3   it, it's three hours different — we will make that available to
4   the Court, and certainly if there are any questions that you
5   have, we will get answers for you quickly.
6            THE COURT:  And is it your understanding that, as
7   Mr. Giordano said, it works off of one's cell phone?
8            MS. STERNHEIM:  That is correct.  With smartphones
9   now, there are all kinds of monitoring capabilities.  For
10  instance, some parents use it for their children, some people
11  use it for their older parents.  I imagine it works along those
12  lines.  The technicalities of it, I can't recite to you, but,
13  as I said, we will get you whatever information you like.
14           THE COURT:  Mr. Vainberg, can you shed any light on
15  any of this?
16           MR. VAINBERG:  Yes, your Honor.
17           I was going through my emails.  One of the last times
18  this came up was in October 2020, when our S.D.N.Y. pretrial
19  services officer, Jonathan Lettieri, emailed Victor Sherman,
20  who was then defendant's counsel, regarding Mr. Sherman's
21  request to use SmartLINK.  And in Mr. Lettieri's pretrial
22  services email, he noted that the officer on this in CDCA let
23  me know that Mr. Becker had brought up the possibility of using
24  SmartLINK, a cell phone application, and that you may be filing
25  a petition with the Court regarding this.  And then

Mr. Lettieri writes: "I wanted to let you know that our office does not use SmartLINK as a viable form of location monitoring. We are not currently employing or offering it to our court as a possible condition to impose. Considering the issues with the current equipment, we would ask that the defendant install a landline in his home so the equipment could be routed through that instead of a cell tower."

This is from October 2020. I don't have -- sitting here today, I wasn't sure that SmartLINK was going to be an issue that would come up, so I don't know if that's still the view of S.D.N.Y. pretrial, but I did want the Court to be aware that it is something that our pretrial office has considered and did not think it was appropriate.

I'd also -- your Honor, I am not aware, in my experience of electronic monitoring, wearing an ankle bracelet posing an impediment to attending conferences or going to trade shows any more, as Mr. Giordano says, having a pacemaker or other metal equipment. It seems to be more of an issue of inconvenience for Mr. Becker to describe why he has an ankle monitor on, rather than an actual impediment to him doing his job. And given that these shows are somewhat hypothetical, it seems like a speculative concern as well.

THE COURT: Mr. Giordano, do you want to address the hypothetical issue?

MR. GIORDANO: I think it's more than a hypothetical,

1    your Honor.  I think it's a reality that he is going to have to
2    gain entry into offices and conferences that have heightened
3    security measures.  His employer, as he represents to me, is
4    well aware of his situation, and if he qualifies for employment
5    there, despite the pending prosecution, not being able to gain
6    entry to these places with the electronic monitor, it is not
7    the fact that he is a defendant facing criminal prosecution,
8    but it is the fact — because his employer is aware of that, as
9    he informed me — but that having this electronic monitoring
10   device is an independent impediment from him gaining entry to
11   these places, and especially in light of the fact that there
12   are reasonable alternatives, that being the SmartLINK app,
13   which is used in the Central District of California, as I
14   understand it.  We also propose that he check in.  With today's
15   technology, there are a number of ways that he can -- whether
16   it be by a photo or FaceTime or sending his location, there are
17   a number of ways that he can show where he is at any given
18   time, that are perhaps better than wearing the ankle monitor.
19              And to Ms. Sternheim's point:  If he is traveling, if
20   the Court was amenable to having restrictions where he can
21   travel out of state with approval of pretrial or the Court, the
22   ankle monitor would pose -- using an alternative method of
23   determining Mr. Becker's actual location is more practical as
24   well, because if the ankle monitor -- the technology doesn't
25   allow him to be monitored out of state with the ankle monitor,

1   then SmartLINK or some other alternative would better determine
2   his location.
3           THE COURT:  All right.
4           Mr. Vainberg, do you want to be heard any more as to
5   that?  And do you wish to be heard with respect to a curfew?
6           MR. VAINBERG:  With respect to -- just briefly,
7   your Honor, thank you.  What's speculative is that there is a
8   conference that Mr. Becker wouldn't be able to gain entry to
9   because he is wearing an electronic monitor.  There's simply
10  been nothing presented to the Court that simply wearing an
11  ankle bracelet would somehow prevent him from gaining entry,
12  any more so than he would be prevented from gaining entry
13  because he is currently facing federal felony charges.
14          And then, obviously, the difference between the
15  smartphone application and an ankle monitor is that the phone
16  application relies on him having the phone with him.
17  Obviously, it's not unheard of, of folks snipping their ankle
18  bracelets, but it's a bit more difficult to do than just
19  dropping your phone off and doing something else.  So it is a
20  more secure manner of monitoring defendants, and one that's
21  used here in this district.
22          With respect to a curfew:  If your Honor is proceeding
23  to lift home confinement, we're happy to be reasonable with
24  respect to a proper curfew, that takes into account any
25  conferences the defendant has to go to, which he would have to

1   get preapproved through pretrial services and a bail
2   modification order, but a general curfew of 9:00 p.m. would be
3   appropriate.
4            MS. STERNHEIM:  Judge, may I be heard on this briefly?
5            THE COURT:  Yes, ma'am.  Yes, ma'am.
6            MS. STERNHEIM:  I just would like to say that if
7   electronic monitoring is lifted, as we requested, and the
8   SmartLINK system is put in place, one of the obligations and
9   requirements would be that Mr. Becker has his phone at all
10  times.  If he did not, then there would be a basis for the
11  Court to find him in default.  But, certainly, there are
12  ways -- if he had the monitor, and there was a way he needed to
13  check in at his location with the phone, he could do that, and
14  he would be instructed, as the Court would, that one of his
15  conditions would be that he needs to have his phone with him at
16  all times, which is a very standard thing that all of us
17  basically have at all times.  So it isn't anything unusual.
18           With regard to the curfew:  It was my understanding —
19  and both Mr. Giordano and government counsel will correct me if
20  I am wrong — there was a time when he was on a curfew from
21  7:00 a.m. to 11:00 p.m., and we would ask that those
22  restrictions of time be reimposed; the difference being that in
23  the central district, he has to use a car, there are severe
24  traffic issues.  If he had a meeting in the evening, he would
25  need sufficient time to get home.  I don't think that there is

1    anything unreasonable about it being till 11:00 o'clock.

2    　　　　THE COURT:  What else, friends?

3    　　　　Does anybody else want to be heard on any other terms

4    and conditions?

5    　　　　MR. GIORDANO:  From the defense, no, your Honor.

6    　　　　MR. VAINBERG:  Nothing further from the government.

7    　　　　THE COURT:  All right.

8    　　　　Based on Mr. Becker's performance and the submissions

9    of counsel, the home confinement condition will be lifted.

10   　　　　The ankle bracelet will be lifted, but I would ask for

11   counsel to confer with pretrial to figure out the phone issue

12   and any additional way of checking in that might be required.

13   　　　　The curfew will be 7:00 a.m. to 11:00 p.m., subject to

14   modification to the extent that pretrial allows it for

15   employment.

16   　　　　Business travel can be throughout the United States,

17   subject to approval in advance by pretrial.

18   　　　　Personal travel will remain confined to the Central

19   District of California and the Southern and Eastern Districts

20   of New York.

21   　　　　The monetary bond will be continued.

22   　　　　Have I forgotten anything, friends?

23   　　　　MS. STERNHEIM:  I would just add, Judge — and this is

24   very, very technical — that, obviously, to get from the Central

25   District of California to the Southern District, you have to

1  travel through many other districts, and it just should be
2  implied that for travel purposes, he can go from California to
3  New York, as necessary, for court appearances.
4          THE COURT:  Certainly, but I thought they had airports
5  in the Central District of California.  Am I wrong?
6          MS. STERNHEIM:  No, you do, but you are in the air,
7  and if a flight stops, let's say, in Chicago, he would then be
8  in another district.
9          THE COURT:  Certainly.  All right, all right.
10         MS. STERNHEIM:  I'm just being technical, Judge.
11         THE COURT:  All right.
12         MR. VAINBERG:  And, your Honor, if I may, I hear that
13 your Honor is lifting the ankle bracelet as a form of location
14 monitoring, but just so it's clear on the order, we'd still ask
15 that the Court order location monitoring through a phone
16 application or other alternative means, other than an ankle
17 bracelet, to make sure that pretrial knows that that's still a
18 condition.
19         THE COURT:  Exactly.
20         And, again, I will ask you folks to confer with
21 pretrial, send me a draft bail modification order, and the
22 removal of the ankle bracelet becomes effective when the bail
23 modification order is signed.
24         Is there anything else, friends?
25         MR. GIORDANO:  Nothing further from the defense,

O6CKBECC

1  your Honor.  Thank you.
2              MR. VAINBERG:  Nothing from the government.  Thank
3  you, your Honor.
4              THE COURT:  Mr. Becker, do you have any questions of
5  what is required of you?
6              THE DEFENDANT:  No, ma'am.  I'm clear.  Thank you so
7  much, your Honor.
8              THE COURT:  Thank you.
9              Andrew, do you need anything from any of us?
10             (Pause)
11             THE COURT:  Very good.
12             Good morning, ladies and gentlemen.  Thank you.
13             (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25