**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 25, 2025

**By ECF**

Hon. Loretta A. Preska
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Re: ***United States v. Brandon Becker***, S3 19 Cr. 704 (LAP)

Dear Judge Preska:

The Government respectfully submits this letter in connection with the sentencing of defendant Brandon Becker, scheduled for March 31, 2025, at 10:00 a.m.

Becker, the former CEO of CardReady LLC, pled guilty in this case after entering into a plea agreement that stipulates an applicable sentencing range of 108 to 135 months' imprisonment. In the Presentence Report,[1] the Probation Office accepted the Guidelines calculations of the parties, and recommended a Guidelines sentence of 108 months' imprisonment. (PSR at 29.) For the reasons that follow, the Government agrees that a sentence of 108 months or otherwise within the Guidelines range is sufficient but not greater than necessary to account for Becker's managerial role in a long-running fraud that deceived credit card processing entities and preyed on over 19,000 vulnerable consumers in debt who collectively paid over $19.7 million.

**I.   The Offense Conduct**

    **A.   The Fraud Scheme**

        1.   Overview

At all relevant times, Brandon Becker was the CEO and owner of CardReady LLC ("CardReady"), a California-based company involved in credit card processing. (PSR ¶ 16). CardReady was a family business, founded in the early 2000s by Becker and his father who passed away in 2008. As part of its business, CardReady found merchants who wanted credit-card-processing services and submitted merchant applications on behalf of those merchants to a Manhattan-based Independent Sales Organization called First Pay (the "New York ISO" in the Indictment). (PSR ¶ 17). First Pay then evaluated the merchant applications under the applicable guidelines, and referred acceptable merchant accounts up the chain to a payment processor, First

---

[1] The Presentence Report filed March 11, 2025 is referred to as the PSR. Defendant's sentencing submission filed March 17, 2025 (ECF 277) is referred to as "Def. Mem." Becker's letter to the Court (ECF 280) is referred to as "Def. Ltr."

Data ("Payment Processor-1" in the Indictment) and to Wells Fargo Bank ("Bank-1" in the Indictment). Wells Fargo and First Data, in turn, opened merchant accounts for eligible merchants, and then processed payments to merchants for purchases by customers who had used credit cards. (*Id.*)

Steven Short was the head of E.M. Systems & Services, LLC and affiliated companies (collectively, "E.M. Systems" or "EMS"), which used telemarketers in boiler rooms to sell debt relief services to customers over the phone. (PSR ¶¶ 16-18). Throughout that telemarketing scheme, thousands of customers were cold-called and enticed to pay fees from $695 to $1,495 in exchange for a guarantee to lower their credit-card interest rates or their overall credit-card debt, as well as provide other purported "budgeting" services. (*Id.* ¶ 18). In reality, what many victims reported receiving after paying up to $1,495 were worthless paper booklets that simply encouraged them to save more money, without actually reducing their interest rates or negotiating a debt reduction with a lender. (*Id.*) By its nature, Short's scheme targeted people who were already in severe financial straits—people whose credit problems were so severe that they were willing to pay up to $1,495 just to get help reducing their interest rate or overall debt burden.

From approximately 2012 until 2015, Becker conspired with Short to have CardReady deceive First Pay, First Data, and Wells Fargo and obtain payment processing for Short's operation. (PSR. ¶¶ 17-20). Short's telemarketing scheme could not start without having payment processing. He needed the ability for his boiler room callers to accept victims' credit and debit cards over the phone, and he needed merchant accounts that would receive that money from the processing entities. As described below, in exchange for an enormous one-third cut of the revenue, Becker agreed to provide payment processing infrastructure for this scheme and over the next two years, obtained 26 fraudulent merchant accounts. In the course of this scheme, Becker, Short, and their co-conspirators obtained approximately $19,718,305 from at least 19,902 victim customers. (PSR ¶ 20). Before the scheme was shut down, it resulted in hundreds of complaints of fraud and deceptive tactics, and over 6,000 successful requests for over $6 million in refunds and chargebacks. (*Id.*)[2]

2. Becker Begins the Scheme

In the summer of 2012, Becker entered into an unlawful agreement with Short through which CardReady would set up sham merchant accounts in the names of straw owners to obtain credit-card-processing services for E.M. Systems. In exchange, Becker and CardReady could retain as much as 34% of E.M. Systems' sales from customers, over *ten times more* than the approximate 2-3% that a typical legitimate business paid for credit card processing. These funds would also be used in part by CardReady to pay any refunds and chargebacks and other fees out of merchant accounts. (PSR ¶ 19). Becker also promised to share half of the profit after all of CardReady's expenses with co-defendant Steven Breier who introduced Short to Becker and served as an intermediary.

The fact that Short was willing to give up an astounding third of his customers' payments to CardReady in exchange for the ability to process those payments through sham merchant accounts made it obvious that Short's telemarketing scheme would be a scam. Nonetheless, Becker kicked off the criminal scheme over e-mail, writing "Let's start!" in an e-mail with the

---

[2] Unlike a refund, which is voluntarily processed by the merchant, a chargeback is a reversal of a transaction initiated by the customer through his or her credit card company due to unauthorized use, fraud, or failure to receive the product or serviced purchased, among other things.

subject line "34 percent deal" to Breier and Berland after receiving detailed information and scripts, that Short's telemarketers would use on consumers. *See* Ex. A.

Becker had been introduced to Short and E.M. Systems by Steven Breier, a sales agent who brought businesses needing merchant accounts to CardReady in exchange for commissions. As Becker and Breier knew, Short could not open and maintain a merchant account in his own name or E.M. Systems' name and truthfully disclose his telemarketing business for several reasons. "Debt consolidation" and "interest rate reduction" services have a troubled history of being used to defraud consumers. Because of this history, credit-card-processing companies, such as Visa and MasterCard, and other payment processing entities Wells Fargo Bank, First Data, and First Pay, prohibited the processing of credit-card charges for interest rate reduction and debt consolidation under their respective guidelines (the "Guidelines"). Further, they actively monitored merchants of all businesses, and permanently terminated accounts that generated an extraordinary number of customer complaints, refunds, and chargeback requests, as Short's business in fact would generate. (PSR ¶¶ 19-21).

Becker directed employees and agents at CardReady to fraudulently subvert those prohibitions and monitoring processes and create dozens of fictitious companies with fictional profiles and identities to apply for fraudulent merchant accounts, which in reality would process payments for E.M. Systems. This was not a new illegal practice that Becker thought up for E.M. Systems. It was a core and systematic part of CardReady's business that Becker was *already using* for other high-risk clients of CardReady who needed processing. (PSR ¶ 36 (signer use beginning at least December 19, 2011)).

Between approximately September 2012 and October 2014, Becker caused 26 sham merchant companies to be opened for use by E.M. Systems, each headed by a straw owner whom Becker, Short, and their co-conspirators called a "signer." The 26 signers for the 26 sham merchants typically had no business of their own and knew little or nothing about E.M. Systems' business. CardReady staff would use the signers' personal information to set up a shell limited liability company for each signer. Next, the shell LLC would be used for the merchant application. In return for signing merchant application and other paperwork, Becker paid the signers nominal fees of a few hundred dollars per month. Becker also compensated the recruiters of those signers a few percentage points of all volume run through the accounts of the signers they recruited. (PSR ¶¶ 22-23).

Becker caused CardReady to submit these fraudulent merchant account applications to First Pay, First Data, and Wells Fargo that concealed that E.M. Systems was the true underlying merchant and misstated various material terms about the nature of the stated supposed business. These applications typically claimed that the merchant was providing "budgeting" or "coaching" services instead of prohibited services such as interest rate reduction or debt consolidation services sold through telemarketing. The applications also falsely described the physical site of the merchant's business, its workplace, and its employees, when in reality the signers had none. Based in part upon these false representations from Becker and CardReady, First Pay serially approved the sham merchant accounts and opened accounts for payment processing with First Data and Wells Fargo. (PSR ¶ 24).

Becker was then able to use these 26 sham companies, with doing-business-as ("dba") names like "Your Next Financial Step", "Budgeting Insights", "Less Costly Living", "Prepared Budgeting", and "consignedsavings.com" to run credit card transactions rung up by telemarketers for E.M. Systems. These companies concealed the true nature of Short's telemarketing scheme.

Becker and his co-conspirators were able to keep the scheme alive even when the credit-card processing companies closed each individual sham merchant account whose consumers reported being defrauded and demanded chargebacks. As the credit-card processing companies shut down one sham merchant after another, Becker and his co-conspirators simply kept opening new ones, defeating the processing companies through a proverbial game of Whac-A-Mole. (*Id.* ¶¶ 15, 19.) The first of these 26 accounts was opened in or about September 2012, and the last account was closed in or about October 2014.  (PSR ¶ 25).

By steering E.M. System's payment processing through these bogus merchant accounts, Becker accomplished a number of fraudulent purposes. First, the use of these bogus merchant accounts made it possible for E.M. Systems to conceal its identity from First Data and Wells Fargo and to maintain payment card processing. This was particularly relevant as First Data repeatedly required CardReady to close sham merchant accounts because of excessive chargebacks and reports of sales of prohibited services. Becker and his co-conspirators then quickly replaced the closed sham merchant accounts with new sham merchant accounts, precluding First Data from shutting down its processing of the hidden but true merchant, E.M. Systems.  Second, the fraudulent processing scheme enabled E.M. Systems to spread out its charges, refunds, and chargebacks across multiple sham accounts. Becker thus enabled E.M. Systems to evade chargeback monitoring programs operated by Wells Fargo, First Data, and First Pay.  (PSR ¶ 26).

For example, under the processing Guidelines, merchant accounts that accrued over 100 chargebacks per month and a ratio of more than 1% of chargebacks to transactions, were likely to be flagged and terminated. The sham merchant accounts associated with E.M. Systems averaged over 10% chargebacks every month after July 2013, and ranged as high as approximately 61% chargebacks in August 2014, two months before First Data terminated the last of the sham merchant accounts. Collectively, these sham merchant accounts exceeded 100 chargebacks per month from July 2013 through October 2014.  However, because E.M. Systems' transactions were split across the sham merchant accounts, none of the sham merchant accounts individually exceeded 100 chargebacks a month, delaying the process by which each Sham Merchant Account was eventually flagged and terminated.  (*Id.*)

       3.  <u>Becker Manages the Scheme</u>

Becker drove the scheme forward by supervising many different CardReady employees and agents who reported to Becker and handled a variety of tasks critical to expanding the scheme. Four of these individuals have pleaded guilty pursuant to cooperation agreements with the Government and provided an extensive inside view into how Becker and they advanced the scheme.  The scheme required extensive coordination: recruiting and paying signers, incorporating companies for signers to use, preparing and submitting fraudulent merchant applications to First Pay, having Short create websites associated with each sham entity, managing the merchant bank accounts, coordinating the money flow to Short's entities, and corresponding with First Pay and First Data when accounts inevitably became flagged for excessive chargebacks and shutdowns. (PSR ¶ 22).  Aside from these four individuals, the EMS scheme was widely known within CardReady, including its risk department, and many other uncharged people within CardReady worked on the relevant accounts as part of their daily duties.

As detailed in an eighteen-page affidavit from a senior executive of CardReady ("Witness-1", Ex. B) who was prepared to testify at trial, [3] Becker led and participated in every key aspect of this scheme. Becker instructed two CardReady agents to personally recruit signers for EMS, tasked a sales assistant to work on boarding and packaging processes for those signers, and directed Witness-1 to coordinate signers' personal information and set up the signers' merchant accounts. Ex. B. ¶ 23). Becker, along with Berland and Witness-1 instructed CardReady's underwriting department to "rubber stamp" and not underwrite the signer merchant applications since they were shell companies CardReady helped create in the first place. (Id. ¶ 35).

Contrary to his assertion that he "wasn't involved with the day-to-day activities of the company" and his supposed "lack of management" (Def. Mem. 7-8), Becker in reality closely supervised the scheme. At the very outset, Becker actively monitored the sales going through the sham merchant accounts and pressed Breier to have Short increase the sales from his boiler rooms. Becker's incentive was obvious: the higher the sales, the greater Becker and CardReady's roughly one third cut of the victims' money. At the beginning of the scheme in 2012, Short texted Breier that he had several "150-man rooms" standing by to sell. But when the early sales were slow, Becker threatened to take away sham merchant accounts from Short and give them to other CardReady clients whom CardReady was also helping to deceive payment processors. (PSR ¶ 28.)

By November 2012, Becker had succeeded in opening three signer merchant accounts to be given to Short for the EMS scheme. On November 7, 2012, Becker wrote to Breier "25% through the mo[n]th and we did 7k across all 32%," complaining that the three active signer accounts given to Short had only processed $7,000 so far. Breier passed on the message to Short hours later, "Only 7k and we are a week into the month?" The next day, Breier wrote to Short "10k across 3 mids [i.e. merchant accounts] first week in. Need to know if we should reassign these mids. Signers need to earn mn- just go this text from Brandon". Put another way, Becker threatened to take away the signer-merchant accounts from EMS and use them to deceive processing entities for a different high-risk client, unless Short could ramp up the sales on those accounts. Short then reassured Breier that his boiler rooms had a terrible first week due to Hurricane Sandy but were gearing up again. (PSR ¶ 29).

On December 10, 2012, Breier again passed on Becker's threat to take away merchant accounts for low sales: "Brandon wants to take the 3rd mid so we need to show him something by [Wednesday]." Short replied, "got your email, should have sales in it in a few hours, we will fill it this month, if I have to run three rooms on the same si[te] till the first of the year." (PSR ¶ 29).

As the scheme advanced, Becker paid multiple recruiters to find people with good credit who could serve as signers for CardReady, and also personally encouraged people he knew to become signers. At least two of the signers used by Becker for the E.M. Systems scheme, B.W.

---

[3] Witness-1 worked for CardReady as an executive Vice President from 2011 until October 2015, and executed the Witness-1 Affidavit in 2016 during the FTC's investigation of this offense. ███████████████ The Government produced the Witness-1 Affidavit to the defendant's former counsel in 2023, along with a subset of other witness statements. Because the Witness-1 Affidavit contains a multitude of personal information about other individuals, and was produced as confidential pursuant to the protective order, the Government respectfully requests that it be filed under seal.

and E.F., were women in their twenties who reported dating Becker. (PSR ¶ 27). Becker paid these women by making them signers, and Becker monitored how much their merchant accounts would earn. For example, on August 28, 2013, Becker instructed Witness-1 over email to make sure that Del Rey, the account associated with E.F., "run[s] to 200k!", meaning that he wanted Witness-1 to have Short channel $200,000 a month through E.F.'s account, which would in turn generate a greater "signer" commission for E.F. (PSR ¶ 27). Becker followed up a day later, writing "[Witness-1] – jump on this – you know what I want to achieve. Thanks".

Witness-1 then explained to Becker that Short had assigned each "floor" (i.e. boiler room) to a specific "mid" (i.e. sham merchant account) with specific customer-facing paperwork matching that sham merchant's name. Short couldn't simply direct all telemarketers in different boiler rooms to temporarily process through E.F's account: "customers cannot be comingled into a single MID – if they were[,] th[en] one would receive paperwork from 'lesscostlyliving' when they are supposed to be working with 'completebudgeting' or whatever the specific site is". Witness-1 reassured Becker, however, that E.F.'s account would process "$145,000 on this particular MID this month", and "there's other activity in other nutra mids for this IBO". (An IBO, or independent business owner was a euphemism for a signer—here E.F.). Put another way, Witness-1 reminded Becker that they had E.F. sign paperwork to open multiple sham merchant accounts, including ones processing nutraceutical sales for other Becker high risk clients unrelated to Short, and that E.F. would also earn signer fees on those sales.

Becker pressed the scheme forward even as it became obvious that Short was flat out scamming consumers. In April 2013, Becker, Berland, and Breier became aware of an FTC action against various Tampa-based telemarketers, who falsely promised to save consumers thousands in credit card debt and reduce interest rates in exchange for a one-time fee between $500 and $2,000. The FTC was therefore prosecuting a highly similar scheme to Short's own Tampa-based debt reduction telemarketing scheme. Berland forwarded Becker the FTC complaint and wrote, among other things, "From what I see there is great exposure and we should be shutting this animal down as quickly as we can do so without it crashing. If they do not have a defense for the type of charges contained in the link here, th[e]n there is no defense that will work and our merchants are fully exposed." (PSR ¶ 30).

In June 2013, Becker received an e-mail with partial recordings of calls with Short's victims, on which telemarketers can be heard discussing interest rate reductions with similar language to the calls alleged in the FTC's April 2013 complaint. Rather than take any steps to "shut[] this animal down" as urged by Berland, Becker expanded the scheme with more sham merchant accounts and chose to continue processing transactions for E.M. Systems. (PSR ¶ 30). Becker continued with the scheme even after he had Witness-1 meet with Short at Short's temporary office space in a strip mall in Tampa, and even after Witness-1 warned Becker that Short did not appear to be running a legitimate business. Ex. B ¶¶ 41-43.

Becker knew that the fraudulent merchant accounts given to Short continued to be shut down by the processing entities based on massive chargeback requests by ripped off consumers. By May 2014, Becker had caused 24 separate signer accounts to be opened and used for the E.M. Systems scheme. On May 23, 2014, Becker and Berland reviewed a spreadsheet emailed by Berland identifying each of these open and closed accounts and showing the excessive refunds and chargebacks requested by victims for each account. Becker wrote, "I'm seeing the Steve Short refunds and CB's at high numbers – we really need to start building the reserve from his side if were [sic] to wind out of this. Especially with the hope of keeping the funds we already earned,

which we must for all the risk." Taking Becker's instruction, Berland informed Short that CardReady would reserve more money that would otherwise be sent to E.M. Systems, writing in part, "These numbers continue to be terrible. If this program was stopped we would bleed out nearly a million dollars in the first three months." (PSR ¶ 31).

Witness-1 and Berland reportedly urged Becker to terminate all business with E.M. Systems in a conference room meeting in the summer of 2014. Ex. B ¶ 46. Rather than stop the scheme, Becker decided to open two more accounts for Short to earn more sales from new victims, which would in turn be used to help Becker and CardReady retain more criminal proceeds while paying down future refund and chargeback requests. In this way, the opening of new fraudulent accounts to target new victims and pay expenses associated with the frauds on prior accounts had a Ponzi-like nature. (PSR ¶ 32).

On June 9, 2014, Becker caused the two additional sham merchant account applications to be submitted to First Pay and First Data for processing. These two accounts processed over $1.6 million of new victim money for E.M. Systems from June 2014 through October 20, 2014, when the last account was closed by First Data. (PSR ¶ 33).

4.  Becker's Systematic Signer Operation

Becker's use of signers to deceive payment processors was not limited to the E.M. Systems scheme. Becker and his employees at CardReady systematized the use of hundreds of signers for dozens of clients other than E.M. Systems between approximately 2012 and 2016. The monthly fees due to these signers and their recruiters, based on the sales in their accounts were closely tracked by CardReady on internal spreadsheets, including one titled "IBO Payments and Overrides_2016-02" maintained by Berland. (PSR ¶ 34).

Through the spreadsheet, CardReady recorded the opening and closing dates of these signer accounts, the name of the signer (referred to as an "IBO"), the recruiter who found the signer, the actual underlying client using the signer account (like "EMS"), the sales, refunds, chargebacks, and net proceeds generated by that account each month, and the commissions, typically amounting to 1-3% of net sales, that CardReady therefore owed the signer and his or her recruiter. The spreadsheet shows approximately 811 signer accounts associated with approximately 273 different individual signers, with certain signers nominally owning multiple sham merchant accounts. According to the spreadsheet, these 811 signer accounts were used by 38 actual clients between approximately 2012 and 2016, including the 26 signer accounts used by E.M. Systems. (PSR ¶ 35).

Becker deployed signer accounts before, during, and after the E.M. Systems scheme. The earliest listed signer account was opened on December 19, 2011—more than half a year before the beginning of the E.M. Systems scheme in the summer of 2012. The latest listed signer account was opened in August 2015, nearly a year after First Data terminated the last of the E.M. Systems scheme accounts in October 2014. The spreadsheet shows that signer accounts (including ones opened with the assistance of signers recruited by Mansori) were generating sales and commissions as late as February 2016. (PSR ¶ 36).

     5.  Becker Eludes His FTC Judgment Obligations

On July 7, 2015, the Federal Trade Commission ("FTC") and the Florida Office of the Attorney General ("Florida AG") filed a federal complaint for a permanent injunction and other relief against Steven Short, E.M. Systems, and other entities and individuals involved in the telemarketing scheme. On January 8, 2016, the FTC and Florida AG filed an amended complaint naming Becker, Berland, Andrew Padnick, and Cardready LLC as additional defendants. On January 17, 2017, a stipulated order was entered against Becker, Berland, and CardReady LLC banning them from engaging in payment processing and entering a judgment of $12,365,731, of which the CardReady defendants were required to pay $1,800,000 within fourteen days to suspend the judgment. According to the FTC, Becker has not complied with and paid any of the judgment. (PSR ¶ 37).

### B. Loss Amount, and Unpaid Restitution and Forfeiture

As a result of this fraud scheme, according to records compiled by the FTC, approximately 19,902 customers of E.M. Systems paid approximately $19,718,305. More than $6 million of this amount was repaid during the scheme, as customers demanded refunds and chargebacks based on allegations of fraud, deceptive tactics, and failure to receive the purchased services. (PSR ¶ 20.) Many other customers, however, requested but never received a refund or chargeback, as described below.

Thus, the net actual loss to victims in this case was $12,365,731. Indeed, this is the precise amount of the civil monetary judgment to which Becker agreed in a "Stipulated Order of Permanent Injunction and Monetary Judgment" (PSR ¶ 37). After additional fees were taken out by upstream payment processors such as First Data and First Pay, the remaining amount received by CardReady is $11,405,964, which forms the basis for Becker's forfeiture. (PSR ¶ 120.)

## II. Guidelines Calculation

The Probation Office has calculated the U.S. Sentencing Guidelines applicable to this offense consistently with what the parties stipulated in their plea agreement. (PSR ¶¶ 51-63.) While seeking a sentence outside the Guidelines, the defendant does not challenge the accuracy of Probation Office's Guidelines calculation to which he stipulated. Def. Mem. 2.

Becker's total offense level under the Guidelines is 31, based on the following:

• The offense has a base offense level of 7 pursuant to § 2B1.1(a)(1);

• A 20-level increase is warranted pursuant to § 2B1.1(b)(1)(K) based on an aggregate intended loss amount over $9,500,000 and less than $25,000,000[4];

• A 4-level increase is warranted pursuant to §2B1.1(b)(2)(A)(i) and (ii) because the offense involved 10 or more victims and was committed through mass marketing;

---

[4] The PSR, consistent with the Indictment, correctly states that the scheme obtained more than $19 million from Bank-1 (but less than $25 million), which represented money processed and charged from the 26 sham merchant accounts caused to be opened by Becker from thousands of customers targeted by Short's telemarketers. (PSR ¶¶ 2, 20).

- A 2-level increase is warranted pursuant to § 2B1.1(b)(17)(A) because the defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense;

- A 3-level increase is warranted pursuant to § 3B1.1(b), because the defendant was a manager or supervisor of the scheme and the criminal activity involved five or more participants or was otherwise extensive; and

- A 3-level decrease is warranted pursuant to § 3E1.1(a) and (b) because the defendant demonstrated acceptance of responsibility for the offense by timely entering a guilty plea.

Becker's criminal history category is I. (PSR ¶ 66). Based on an offense level of 31 and a criminal history category of I, the applicable Guidelines range is 108 to 135 months' imprisonment. (PSR ¶ 106).

### III.  Sentencing Legal Principles

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, 18 U.S.C. § 3553(a), which are: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States* v. *Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

Under Section 3553(a), "in determining the particular sentence to impose," the Court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112; *see also United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Crosby*, 397 F.3d at 112. Third,

the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## IV.    Section 3553(a) Analysis

In his plea agreement, Becker agreed that the loss amount in this case exceeds $9.5 million, and that his applicable sentencing range under the U.S. Sentencing Guidelines is 108 to 135 months. In the Presentence Report, the Probation Office has recommended a Guidelines sentence of 108 months. In light of Becker's managerial role in the huge and longrunning fraud charged in this case, the Government agrees and respectfully submits that a sentence within the applicable Guidelines sentencing range of 108 to 135 months is necessary to reflect the seriousness and aggravated nature of Short's crimes, provide just punishment, afford general deterrence, and promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A).

### A.    The Nature and Circumstances of the Offense

#### 1.    The Defendant's Role

Becker was plainly the leader and orchestrator of the offense, as evident by the record and the managerial enhancement to which he plead. But rather than fully accept responsibility for his role and the financial devastation he caused, Becker now offers a false counter-narrative in which he was a "drunk" and "absent" CEO, uninvolved in the day-to-day business of CardReady, and led astray by his own subordinates. (Def. Mem. 7-8). He claims that he "let the wrong people influence the direction of the company and the practices he was willing to pursue." Def. Mem. 7. He principally lays blame at three individuals: James Berland, an elderly associate of his father, who died last summer, Maziar Mansori, who was one of several recruiters of signers, and Steven Breier, who was the intermediary between Becker and Short. While Becker's guilty plea obviated the Government's opportunity to present detailed evidence and witness testimony at trial about his role, Becker cannot hide from the clear record of his personal wrongdoing.

Becker first faults Breier for bringing EMS to CardReady. "Mr. Breier continued to press CardReady to take another look and accept EMS as a merchant. Eventually, Mr. Breier was successful and CardReady submitted merchant accounts for EMS to First Pay Solutions." Def. Mem. 8. He entirely minimizes his role in his letter to the Court: "I failed by allowing Steven Brier to use his influence over me, and the senior staff, including risk. This error allowed Steven Short and his company EMS to access our partner FPS to accept payments, which is why I am now before Your Honor for sentencing." Def. Ltr. 2 (ECF 280). In this telling, Becker omits to acknowledge that *he* was the CardReady decisionmaker who negotiated with Short and Breier, culminating in his "let's start!" e-mail. Becker then set the scheme in motion, announcing the 34% deal within CardReady and tasking subordinates to manufacture signer accounts for submission.

As for the rest of the scheme, Becker claims that he "abdicated responsibility to Mr. Berland, a person he respected due to his close relationship with his father". Def. Mem. 8. He also gratuitously calls out the "criminal background and substance abuse issues" of Maziar Mansori, whom Becker used to recruit signers and who introduced Becker to First Pay Solutions. But there can be no dispute that Becker directed both individuals, overruled them (such as when Berland wanted to "shut this animal down" in 2013), and profited far and above them from this fraud.

Becker did not orchestrate the EMS scheme in a vacuum. For approximately three years, between the summer of 2012 and the fall of 2015, Becker operated a credit card processing entity that systematized the type of deceptive merchant bank fraud used in this case. As described above, CardReady staff under Becker's supervision were recruiting signers as early as December 2011, more than half a year before Short entered the picture; through 2016, CardReady had operated over 800 signer accounts, associated with 270 different individual signers, for approximately 38 actual clients including Short. (PSR ¶¶ 34-36). This was Becker's business model. As Witness-1 estimates, during the approximate time period of this offense, approximately 80% of CardReady's processing volume was associated with high risk clients (Ex. B ¶ 10), and about 30% of CardReady's clients were serviced with signer accounts (*id.* ¶ 19). Becker is not being held responsible for any processing or losses associated with these hundreds of other signer accounts, but plainly had no compulsion about deceiving the bank and processing entities on a massive scale.

Becker agreed to unleash his deceptive signer infrastructure to support Short's telemarketing operation that could not otherwise truthfully obtain merchant processing. This led to predictable financial devastation for innocent consumers. E.M. Systems' boiler rooms cold-called over 19,000 vulnerable people in debt and promised to reduce their overall debt burdens or negotiate with their lenders in exchange for fees of up to $1,495. These calls were conducted through scripts which carefully screened victims who still had active credit cards that could incur more debt to pay for these guaranteed outcomes. In thousands of instances, however, these representations were deceptive and false, and left victims even more in debt. And none of these victims knew that behind the scenes, Short had agreed to give up a whole third of their money to Becker and CardReady.

Becker also deceived the processing entities. As noted above, the 26 sham accounts helped to conceal Short's real business from the Wells Fargo, First Data, and First Pay, and to perpetuate it. As Wells Fargo and First Data persistently shut down sham merchant accounts after receiving customer complaints of being defrauded, Becker would simply direct his subordinates at CardReady to open new sham accounts in another "signer's" name for Short's telemarketers to use. (PSR ¶¶ 25-26.) Becker instructed his employees to submit false documents to the processing entities to create and maintain his accounts. Such false documents included the account opening documents signed by random people with no connection to his business, and later on, "chargeback reduction plans" that offered false excuses purportedly from the "signer" about the reason for the excessive chargebacks and supposed plans to reduce them going forward.

Becker's participation in this scheme was not a one-time mistake or a fleeting lapse in judgment. Time and time again, Becker made conscious choices to continue to facilitate frauds on countless individual victims, and to cover up his fraud with lies and deception. After the first sham merchant account was successfully opened through misrepresentations to First Pay, First Data, and Wells Fargo Bank, Becker, Breier and Short coordinated opening more merchant accounts to process payments from additional boiler rooms with potentially hundreds of telemarketers. Since merchant accounts were opened by the processing entities with a limit on the total dollar amount of transactions that could be processed each month, such as $100,000 per month, Becker, Short and their co-conspirators carefully planned out how to distribute victims' charges through multiple sham merchant accounts. They discussed when new accounts would open, how many charges to run through each account, and what accounts to use for the maximum billed charge of $1,495.

CardReady employees received and sent Short weekly e-mails with detailed excel spreadsheets reporting on every transaction that his telemarketers processed, including the name of the customer, the sham merchant account under which the customer's credit card was charged, the amounts of each charge, and the total amounts of money being deposited toward the various companies running the telemarketing scheme. Becker came to know that Short's consumers were reporting being deceived after being sold a "package that lowers interest rates," and were filing an extraordinary number of chargeback requests. Becker knew that Short's sham merchant accounts were frequently being closed. It did not matter. Becker could simply open new sham merchant accounts that would appear to be brand new companies. Every time he did that, Becker made a separate, conscious choice to defraud the payment processors and prolong the fraud on the consumer victims. And he made that choice repeatedly over the course of more than two years. This systematic, methodical, and egregious conduct supports a substantial sentence of incarceration.

Becker's conduct during this scheme, like Short's, was marked by pure greed and disregard for the well-being of his victims. He knew he would be facilitating a telemarketing operation that would be cold-calling customers in credit card debt and charging upwards of $1,495 for a guaranteed savings outcome. He knew that Short agreed to give up approximately one third of each customer's charged payment to CardReady for its cut and other processing fees, before paying the telemarketers their commissions, leaving only the remainder for any potential legitimate work in reducing victims' debt. Becker knew that (1) Short he could not obtain and maintain processing through a legitimate merchant account, and (2) Short could afford to give up an extraordinary one third cut to CardReady because of the excessive amounts charged to his victims.

These clear red flags were readily apparent to Becker and others at CardReady at the outset. Witness-1 relates,

> I talked to Becker in my office and expressed reservations about taking on the E.M. Systems business. I told him I was concerned that CardReady did not have enough information about Short or E.M. Systems to verify that their business was legitimate. I also told him I was suspicious of Short because he had agreed to give away 32% of his company's revenue in exchange for the ability to accept credit cards from customers. Becker told me he agreed that we needed to learn more information about Short before doing business with him, but to my knowledge, he took no steps to learn more about Short or E.M. Systems before commencing the deal. Becker told me he wanted us to open signer accounts for E.M. Systems, and that we would monitor E.M. Systems revenue and chargebacks to better understand his business practices.

Ex. B ¶ 26.

When the first signer merchant accounts began being shut down by First Data because customers were complaining of being defrauded, Becker could have terminated Short as a client. He did not, because the point of using signer accounts was to allow Short to maintain processing through such shutdowns, and to make money. As Witness-1 explains:

> First Data would send risk notification ("RN") emails to First Pay that warned of high rates of customer chargebacks that were being filed against for the signer accounts. . . . Over time, these RN emails became a normal course of business with the E.M. Systems merchant accounts. It was understood within the office between myself, Berland, Becker, [and two underwriting employees] that every E.M.

Systems signer account forwarded would eventually get flagged by First Data. The only question was how long before this would occur.

Ex. B ¶ 37.

In addition to profiting himself, Becker used this fraudulent scheme to finance the lives of women he casually dated (while married to his current wife). He gave explicit directions to CardReady employees to gather information from these women, fill out applications replete with false statements about their supposed businesses and employees, and directed employees to make sure one of their accounts received the maximum $200,000 of monthly volume. As the Court recalls, while on bail, Becker improperly contacted one of these women and pressured her to be interviewed by what turned out to be his prior criminal counsel.

At every step when Becker could have elected to terminate the scheme, he made the deliberate choice to expand it. When Berland consulted with Becker about the FTC lawsuits against highly similar Tampa-area telemarketing operations, Becker instructed him to keep Short's business processing. He sent Witness-1 to observe Short's operation in Tampa, but then chose to ignore Witness-1's report that Short's business did not appear to be legitimate. He discussed the rising chargebacks and refunds with Berland, and decided that the right solution would be to get new money from new accounts akin to a Ponzi scheme. These are not the actions of a "shell of a company leader" who was absent. Def. Mem. 8.

Nor did Becker "cho[o]se to stay drunk and avoid confronting the massive chargebacks" from the EMS scheme. Def. Mem. 8. He made a deliberate choice to victimize more customers *in order* to have enough money to pay for those chargebacks while still making a profit. He confronted the problem by choosing more fraud. By May 2024, Becker pressed the scheme forward even as it escalated to new heights. At least 16 of the then-existing 24 sham merchant accounts secretly being used by E.M. Systems had already been closed or were pending closure by First Data. Chargebacks and refunds made plain that customers were being defrauded en masse. According to the spreadsheet sent by Berland to Becker, in May (partial month), April, and March 2014, the E.M. Systems accounts had paid a total of over one million dollars in refunds and chargebacks, while conducting over $3.6 million in sales.

In the preceding month, a lower-level CardReady employee had called some of the consumers who disputed the charges appearing on their credit card bills from these sham merchant accounts. In an internal CardReady document, the employee reported, for example, that one consumer "said she received a call out of the blue from Resources Financial Budgeting, saying they could decrease her credit cards to 3%, and have $3,500.00 paid on her Capital One credit card for a $895.00 one time fee. . . . she's [yet] to see the $3,500.00 paid on her Capital One credit card." (Ex. C.) Another customer reported that she was told by two agents on a phone call that she had no choice but to utilize their company's services to lower her APR, interest, and payments. As the CardReady employee remarked in this internal document upon learning that the consumer's age was 50: "At first I thought merchant preying on the elderly. It appears they are preying on all." *Id.*

And yet, Becker did not stop the scheme. Becker knew that even if no new sales were made, it would cost nearly a million dollars just to cover the expected chargebacks by prior victims. Becker did not want to pay that money out of their own profits. He directed Berland to hold back more of Short's proceeds in reserve and launched two more sham merchant accounts to continue

bringing in new victim money. Rather than ending the scheme, he and Short agreed to victimize additional people. Between June and October 2014, these last two accounts processed over $1.6 million from new victims for Becker, Short and his co-conspirators, until they too were closed by First Data. At the same time, CardReady came under regulatory and payment processing scrutiny, effectively ending the scheme. First Data traced many of the signer accounts back to CardReady and on November 12, 2014 issued a client alert advising that it was no longer accepting merchant applications from CardReady LLC and Brandon Becker, among other listed entities and individuals. There can be little doubt that if First Data had not cut off CardReady, Becker would continue submitting fraudulent merchant accounts. Indeed, Becker continued using signer accounts for a whole year after the EMS scheme ended with other processing entities, entirely undeterred by the collapse of this scheme.

## 2. The Impact on the Victims

Remarkably, Becker chooses not to seriously acknowledge his victims in his sentencing memorandum. His sentencing submission simply notes that "[h]e does not expect forgiveness from those who were harmed during the fraud, but he does maintain an acute desire to create a positive impact in his community" Def. Mem. 13. He then quickly pivots to identifying his "greatest regret," which is the "impact his choices and actions had on his marriage and family." *Id.* Becker appears to elide the thousands of vulnerable people in debt who were scammed into paying up to $1,495 for worthless paper booklets, and his role in facilitating that fraud. A review of the statements made by these victims as part of their complaints is a haunting tour of the human wreckage caused by a fraud of this scope and dimension.[5]

The victims are a diverse cross section of people of all ages, backgrounds, and life circumstances. They include disabled people struggling to survive on limited social security payments. There are older people, pensioners whose days in the workforce have concluded, with no means of repaying their debts. In this scam, all of the victims have in common the additional aggravating fact that they were targeted for already having significant credit card debt. These were not wealthy people who lost money in a risky investment. They were people struggling to handle their financial situation and desperate for a guaranteed promise to lower their existing debt.

For example, the victims include a 72-year old Michigan woman[6] working part time in retail who was scammed out of $1,095 in exchange for a guaranteed lower interest rate and savings of $3,000 and obtained neither, causing significant hardship: "As a result of their refusing to refund my $1095 or lower the interest rate as promised, I was forced to find an alternative method of attempting to pay off my credit card debt. I ultimately had to liquidate my 401K in order to finish off the upstairs of my property in order to refinance which only caused me more financial stress." (Ex. G-1, ¶ 18.) A 62-year-old victim who had to stop working due to medical reasons was scammed out of $1,295 through a false promise to lower interest rates on her credit cards, reported that she "[felt] mentally tormented, especially because I repeatedly called customer service and received no help from the company. (Ex. G-2, ¶¶ 3, 29.) A 78-year-old retiree in Kentucky was promised an interest rate reduction in about 15 days and savings of at least $4,000 in exchange for a $695 payment; in many ensuing calls thereafter, the customer service representatives then repeatedly told him they were working on the reduction and refused to refund

---

[5] The Government is enclosing victim statements made in declarations to the Federal Trade Commission which it respectfully requests to file under seal to maintain their privacy.

[6] All ages reported are as of the time of the victims' declarations to the FTC, principally in 2015.

his money. (Ex. G-3, ¶¶ 5-13.)  Another senior citizen from Florida, paid $1,095 to lower her high interest rates on debt incurred from home repairs caused by a hurricane.  (Ex. G-4, ¶ 4.) At the time she was targeted by Short's telemarketers, she was also dealing with profound medical issues. (*Id.*) After persistently calling customer service, only to be promised a call back that never came, she heard that the telephone number had been disconnected. A 78-year-old retiree from Colorado living off approximately $650 a month from Social Security was charged $1,095, an additional expense that was a "tremendous burden." (Ex. G-5, ¶¶ 3, 23.)

Some victims maxed out their credit cards with these bogus charges.  Others were told that the fee would max out their card and were instructed to give the telemarketers a card with a lower balance to run the charge. (*See, e.g.,* Ex. G-6, ¶ 6.) A disabled, retired former U.S. Postal Service employee from Puerto Rico had to provide three different credit cards because the first two did not even have enough of a credit limit to accommodate the $1,495 charge. (*Id.*)

Many of these victims received the cold calls during a particularly vulnerable time in their lives.  As another victim, a then-63-year-old clerical employee from New Hampshire,  who was scammed out of $1,295, put it:

> When the economy dropped, I began to rely on credit cards for things like oil, property taxes and sometimes groceries.  As I am a single paycheck household, I really felt the pinch.  Then my younger sister moved in with me due to her financial troubles.  It was an additional financial drain for me and I relied on credit cards even more. . . . All during this time, I was trying to get out from under that debt without having to declare bankruptcy.  So the call by Resourceful Budgeting came at a time I was very vulnerable."

(Ex. G-7, ¶ 6.)

Another victim, a 65-year old woman from Iowa, received the call while she "was working 12 hour nights at a battery factory and was on the verge of losing my job because the lant I was working at was scheduled to close." (Ex. G-8, ¶ 3.)

A former factory worker received a cold call from Insightful Budgeting (one of the 26 sham merchant names) just a week after she retired to take full time care of her disabled 78-year-old husband.  "The call from Insightful Budgeting came the next week and I thought it was an opportunity help dig us out of the hole we were in." (Ex. G-9, ¶ 7.)  After paying $1,095 to lower her interest rates, she received a "customized budget plan", which "was not a plan at all" but "just said to pay more on each credit card and the card would get paid off quicker than if I just continued to make the minimum payments.  That was just common sense and not advice I would pay $1,095 to receive." (*Id.* ¶¶ 9, 17.)

In many cases, as shown by the attached victim affidavits (Ex. G-1 to G-26), consumers were falsely told that interest rate reductions were in progress to placate them, and to make it less likely that a chargeback would be successful due to the passage of time from the initial charge. They experienced additional stress persistently trying to get ahold of the customer service for these sham companies to check on their interest rate reductions or refund requests that never came.

Indeed, the sheer diversity of woe in Becker's wake distinguishes him from many other types of white collar fraudsters in this District.  This is not a case in which the measures of harm verge on the theoretical.  The defendant ran an organization that facilitated telemarketing frauds on thousands of real people.  He and his co-conspirators lied to a bank and processing companies

to process the money from those thefts. He did it on a grand enough scale to have caused over 19 million of dollars in damage. His sentence should reflect the reality of the pain he caused.

Throughout the scheme, Becker continued to launch additional merchant accounts for more of Short's boiler rooms even as the prior accounts were being closed and his victims were filing of complaints and chargeback requests. He did not care. He did not stop. He did not cut his victims' losses. He simply committed more and more frauds, with more lies, more victims, and more devastation in his wake. The extraordinary damage Becker has caused to his innocent victims warrants a stiff punishment within the Guidelines range.

## B.  History and Characteristics of the Defendant

Unlike many defendants sentenced by this Court, the defendant enjoyed a privileged upbringing in a wealthy family. (PSR ¶ 76). His parents provided him and his sister with all necessities and luxuries they desired, in a supportive family setting with no abuse or mistreatment. (PSR ¶ 77). He inherited a financial business from his father with multiple employees. Becker's decision to run a sophisticated bank fraud show that his crimes were driven by greed, and not by financial necessity.

It is true that like most people, Becker has also suffered hardship in his life. At age seven, he reported experiencing a home invasion, which his father shot an intruder. (PSR ¶ 76). He had a close and loving relationship with his father who tragically passed away in 2008. (PSR ¶ 74). While the Government is sympathetic to these circumstances, none of them can justify in any way Becker's intentional decision many years later to commit a multi-year $19 million fraud on thousands of innocent consumers and the processing entities.

As part of his sentencing advocacy, Becker has retained a psychologist who interviewed him in January 2025 and administered the Minnesota Multiphasic Personality Inventory-2 (MMPI) test, which concluded that Becker "generated a normal clinical profile". ECF 277-1 at 7. Becker has no evidence of a clinical disorder that could be pointed to as mitigation or partial explanation for his intentional decisions to commit the frauds in this case.

Becker has submitted a multitude of letters attesting to his positive personal qualities as a family man and friend. It is, of course, appropriate for the Court to take these letters into account in connection with sentencing. However, the Government asks that, in so doing, the Court consider the following four points. First, these attestations to Becker's positive personal qualities do not distinguish him from other similarly situated white-collar defendants—individuals who, despite having many opportunities and a network of people who love and support them, nonetheless choose to steal and defraud. As Judge Marrero astutely observed, this sort of letter:

> falls into a pattern advanced by a subset of the white collar criminal. . . . The list of their    achievements and virtues is long and impressive. Let us count the ways. At home, they are      good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010).

Second, the letter writers' attestations to Becker's positive qualities, such as the claim that he is a person of strong integrity who built successful honest businesses (Def. Mem. 11), have

diminished value because Becker has demonstrated an extraordinary ability to operate a scheme that deceived sophisticated processing entities and thousands of customers. Becker successfully maintained the scheme from detection by a large financial institution and sophisticated payment processors that had departments dedicated to detecting fraud. Given that Becker was successful in deceiving so many people for so long, the attestations he has presented to his positive character do not bear significant weight.

Remarkably, Becker appears to have solicited a letter from a family member whom he involved in the EMS scheme. *See* Def. Mem. 277-6 at 57 (letter from aunt Sue Pawlin). The record shows that Ms. Pawlin had worked at CardReady incorporating and dissolving LLC companies for signer accounts through a company named Vcorp Services, and setting up bank accounts for these signers. *See, e.g.*, Ex. D (Jan 4, 2014 correspondence between Pawlin and VCorp re paying invoices for various company corporate services including "Pandora's Box LLC", "VHapner LLC", and "Wibowo Products Inc" which were used for EMS); *see also* Ex. B ¶ 32. Neither the defendant nor Ms. Pawlin appear to acknowledge that history, evident through hundreds of emails involving Ms. Pawlin turned over in discovery.

Third, Becker suggests that he warrants a lighter sentence because he "has already suffered significant and lasting consequences because of his crimes" like having to "live with a felony conviction and its attendant consequences including exclusion from working in many finance-related fields." Def. Mem. 17. This claim should be rejected. By 2015, the charged EMS scheme was terminated and Becker continued using signers for other high risk clients. He entered into a stipulated judgment with the FTC for $12,365,731—which would be suspended upon Becker and other defendants' payment of $1,800,000. He apparently failed to pay a penny, despite his significant resources (reflected on financial statements Becker provided to the FTC) and the millions of dollars earned through the scheme. Meanwhile, many of his victims have continued to struggle.

In any case, any notion that successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot not be countenanced. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) (citing U.S.S.G. § 5H1.2); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same

> class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

Finally, as discussed above, this is *not* a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment or where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life. For more than two years, Becker's full-time job was overseeing an operation that systematically defrauded processing entities and a bank, and earned millions of dollars from processing the proceeds of a telemarketing fraud.

To be clear, Becker should be commended for the obvious positive impact he has had on the many people who have taken time to write to the Court and for his efforts within his community. The Government does not in any way question their sincerity. But the defendant's character is equally demonstrated by his abhorrent conduct in this case, fueled by greed and causing millions of dollars of harm to thousands of vulnerable people.

## C. The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States* v. *Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* It is particularly important to deter those individuals, like the defendant, who have the skill and ability to victimize people remotely, such as a telemarketing operation in Florida that reached over 19,000 people nationwide.

There is also a heightened need for specific deterrence in this case. As noted, the defendant was motivated by greed, undeterred by the potential consequences. When his subordinates expressed concern at the outset about Short's legitimacy and willingness to give away 32% of his company's revenue in exchange for the ability to accept credit cards, Becker directed them to recruit signers to pose as merchants for EMS. (Ex. B ¶ 26-27). In the middle of 2013, the defendant got another clear warning, in the face of an FTC enforcement litigation against telemarketing debt relief companies in Tampa (where Short's operation was based) that falsely promised to save consumers thousands in credit card debt. As Berland wrote to Becker and Breier, attaching the FTC complaint, "From what I see there is great exposure here and we should be shutting this animal down as quickly as we can without it crashing. If they do not have a defense for the type of charges contained in the link here, there is no defense that will work and our merchants"—i.e. the signers—"are fully exposed." Just like Short's telemarketing scam, the entities charged in that complaint cold-called consumers and promised them interest rate reduction, and then sent consumers nothing more than a rudimentary financial plan that included a comparison between how much consumers would pay on their debts if they only paid the minimum

amount versus greater payments toward principal.  Far from being deterred from the FTC's pursuit of exactly his type of scam, Becker continued operating the scheme.

In the Spring of 2014, Becker was not deterred by payment processors rapidly closing merchant accounts who were experiencing a tidal wave of chargeback and refund requests.  He simply doubled down and opened more accounts for Short to victimize more people.  In fact, even when the accounts were all closed in 2015 and CardReady lost its ability to submit merchants to First Data, Becker continued running his signer account infrastructure for other clients and other processing entities.  The Government respectfully submits that a significant prison sentence is necessary to truly impress upon Becker the wrongfulness of his actions and deter him from future misconduct.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

A sentence within the Guidelines ranges of 108-135 months would also avoid unwanted sentencing disparities, taking into account the sentence of 78 months imposed on Steven Short on May 2, 2023.  Short's sentence was at the bottom of his Guidelines range of 78 to 97 months imprisonment, based on an offense level of 28.  Becker's Guidelines range is based on an offense level of 31 with an additional three-level increase accounting for Becker's more culpable role as a manager and supervisor of the offense under U.S.S.G. § 3B1.1(b). (PSR ¶ 57).  That enhancement is well necessitated by Becker's management of the entirety of CardReady and supervision of multiple employees and agents (four of whom have pleaded guilty in addition to Short).  As the most culpable individual in the scheme, Becker should face correspondingly higher punishment.

## V.  Orders of Restitution and Forfeiture

In advance of sentencing, the Government will submit a proposed Order of Restitution consistent with the plea agreement and the PSR (PSR ¶¶ 7(l), 116) directing restitution to 1,961 victims in the amount of $1,910,600.05.

The Court should also order forfeiture of $11,405,964.  That forfeiture amount was also agreed in the plea agreement, representing the amount of the fraud proceeds of which Becker had custody or control.

### CONCLUSION

For the reasons set forth herein, the Government respectfully submits that Becker should receive a sentence within the stipulated Guidelines sentencing range of 108 to 135 months, as recommended by the Probation Office, and that the Court should enter the attached proposed order of restitution.

Respectfully,

MATTHEW PODOLSKY
Acting United States Attorney

By:  _____/S/_____
     VLADISLAV VAINBERG
     TIMOTHY CAPOZZI
     Assistant United States Attorneys

(212) 637-1029 / 2404

cc: Nina Marino, Esq. (by ECF)